Annick Persinger (State Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
apersinger@tzlegal.com

Hassan A. Zavareei (State Bar No. 181547)
Kristen G. Simplicio (State Bar No. 263291)
**TYCKO & ZAVAREEI LLP**
1828 L Street, Northwest, Suite 1000
Washington, District of Columbia 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
ksimplicio@tzlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Katie Ogdon, an individual, on behalf of herself and all others similarly situated,<br><br>   Plaintiff,<br><br>   vs.<br><br>Grand Canyon University, Inc., an Arizona corporation, Grand Canyon Education, Inc. d/b/a Grand Canyon University, a Delaware corporation, Brian Mueller, Dan Bachus, and Stan Meyer,<br><br>   Defendants. | No. 1:20-cv-00709-DAD-SKO<br>Assigned to the Hon. Dale Drozd<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>**(1) RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**<br>**(2) FALSE ADVERTISING LAW;**<br>**(3) UNFAIR COMPETITION LAW;**<br>**(4) CONSUMER LEGAL REMEDIES ACT;**<br>**(5) UNJUST ENRICHMENT** |

On behalf of herself and all persons similarly situated, Plaintiff Katie Ogdon submits this First Amended Complaint against Grand Canyon University, Inc., Grand Canyon Education, Inc., Brian Mueller, Dan Bachus, and Stan Meyer (collectively referred to herein as "Defendants"), pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), alleging as follows:

## I.  INTRODUCTION

1.      Defendants are engaged in a nationwide racketeering scheme to defraud graduate students in connection with the operation of a for-profit university, Grand Canyon University. Defendants have set up an online education program, through which they offer graduate degrees in a variety of professional areas that are subject to state regulation, such as health care and education ("Regulated Professions"). While Defendants advertise these graduate degrees as being suitable for employment in the Regulated Professions, in reality, the programs do not meet the accreditation standards of many states' licensing boards. Because licensure is a necessary precursor to post-graduate employment in these professional fields, no reasonable student would enroll in professional degree programs if they knew that the degree would not qualify them to work in their desired profession. Thousands of students have been tricked into enrolling, only to find themselves deeply in debt and unable to obtain work in their chosen field.

2.      To accomplish their scheme, Defendants train their recruiters to use sophisticated psychological techniques to deceive students, and then fire those recruiters who do not enroll enough students, financially incentivizing them to engage in acts of deceit. The former practice raised the alarm of a Senate committee; the latter practice is forbidden by the Department of Education. But Defendants have been engaging in these practices for years; not only has Defendant Grand Canyon Education been sued for its fraudulent recruiting practices, but the three individual Defendants previously ran another for-profit university that was sued by various government agencies multiple times.

3.      The previous lawsuits and multimillion-dollar settlements, however, have not deterred Defendants, who continue to defraud students to enrich themselves. While traditional non-profit

universities must invest tuition revenues into the educational and charitable mission of the university, Defendants have structured themselves to ensure that tuition money—which is borrowed by students from the federal student loan program—is drained out of the university and into their pockets. And to avoid burdensome regulations on for-profit universities designed to reduce the incentive for fraud, Defendants attempted to reorganize themselves by setting up a phony non-profit that would not be bound by those regulations. But the Department of Education rejected this plan because the non-profit remained under the control of Defendants, who continued to transfer all the funds out of the school and away from academics for their own benefit.

4.      Because of the way in which Defendants have designed their scheme, fraud is inevitable. The university cannot offer meaningful opportunities for post-graduate employment because the overwhelming majority of funds are diverted away from the academic mission. Thus, Defendants must rely on fraud to enroll students and maintain their profitability. As a result of Defendants' fraud, students are induced to spend time away from their families and jobs—often hundreds or even thousands of hours—and take out federal student loans that they will be saddled with for decades, for no increased professional opportunities. Indeed, no student would ever knowingly enroll in a professional degree program and expend years taking classes and completing coursework, while becoming indebted for tens of thousands of dollars in federal student loans, to obtain a degree that is not accepted because the program is not accredited for its intended purpose.

5.      Plaintiff Katie Ogdon is one victim of this nationwide scheme. She is a citizen of the state of California who signed up for Grand Canyon University's Master of Science in Psychology with an Emphasis in Health Psychology program. She only did so based upon the assurances of Defendants' "counselors"and "advisors"—the titles given to their financially motivated recruiters—and other personnel that the program was suitable for her intended career, which was to be a mental health therapist in the state of California. Two years and tens of thousands of dollars in tuition later, she discovered that Grand Canyon University was not accredited in such a way so as to qualify her and those similarly situated for professional licensure and/or practice in California and thus she could not

become a California-licensed mental health therapist as she was led to believe. Ms. Ogdon brings this action to hold Defendants accountable for operating an illegal racketeering scheme, and for violating California law.

## II.    PARTIES

6.     Plaintiff Katie Ogden is, and at all times relevant to this complaint was, a resident of Fresno, California.

7.     Defendant Grand Canyon University, Inc. ("Grand Canyon") is an Arizona corporation registered to do business in California. It was previously known as Gazelle University, Inc. Its sole member is non-defendant Grand Canyon University Foundation (the "Foundation"). Grand Canyon is registered to do business in California. Grand Canyon has already been served with process.

8.     Defendant Grand Canyon Education, Inc. ("GCE") is a Delaware corporation and is the publicly traded holding company that controls Grand Canyon. It trades on the NASDAQ exchange under the symbol "LOPE," which is based on the school's mascot, the antelope. Until approximately June 30, 2018, it did business under the name Grand Canyon University. It is registered to do business in California and has already been served with process.

9.     Defendant Brian Mueller is, and at all times relevant to this First Amended Complaint was, the President of Defendants Grand Canyon and GCE, as well as the Grand Canyon University Foundation, and in those roles, directs and oversees the fraud and racketeering enterprise described herein.

10.     Defendant Dan Bachus is, and at all times relevant to this First Amended Complaint was, the Chief Financial Officer of Defendant GCE, and in that role, directs and oversees the fraud and racketeering enterprise described herein.

11.     Defendant Stan Meyer is, and at all times relevant to this First Amended Complaint was, the Chief Operating Officer of Defendant GCE, and in that role, directs and oversees the fraud and racketeering enterprise described herein.

12.     The named Defendants identified in Paragraphs 7 and 8 of this First Amended Complaint are collectively referred to hereafter as the "Corporate Defendants." The Defendants identified in Paragraphs 9 through 11 are collectively referred to herein as the "Individual Defendants."

13.     As described in more detail in Paragraphs 35, 59-60, multiple entities have done business as "Grand Canyon University," including Defendant Grand Canyon and Defendant GCE. Where the term "University" is used in this First Amended Complaint, it refers to the collection of non-Defendant academic personnel such as instructors, as well as assets, such as the physical campus, intellectual property, and course materials. Defendants first collectively determined that the University should be under the control of Defendant GCE, until 2018, when they collectively determined to transfer the nominal control of the University to Defendant Grand Canyon. Throughout the Class period, all Defendants directed and controlled the University to further their pattern of racketeering and fraud for Defendants' profit.

14.     At all times mentioned herein, Defendants acted as the principal, agent, or representative of each other, and in doing the acts herein alleged, each Defendant was acting within the course and scope of the agency relationship with the other, and with the permission and ratification of the other.

15.     At all relevant times, Defendants have controlled, directed, formulated, known, and/or approved of, and/or agreed to the various acts and practices of each other.

16.     Whenever reference is made in this First Amended Complaint to any act of any Defendant or Defendants, the allegation shall mean that the Defendant or Defendants did the acts alleged either personally or through the Defendant's or Defendants' officers, directors, employees, agents, and/or representatives acting within the actual or ostensible scope of their authority.

17.     At all times mentioned herein, each Defendant knew that the other Defendant was engaging in or planned to engage in the violations of law alleged in this First Amended Complaint. Knowing that the other Defendant was engaging in such unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did

encourage, facilitate, or assist in the commission of the unlawful acts alleged, and thereby aided and abetted the other Defendant in the unlawful conduct.

18.     Each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this First Amended Complaint. Additionally, one or all Defendants acted as the agents of each other, and all Defendants acted within the scope of their agency if acting as an agent of the others.

19.     Each Defendant is a "person" as defined in Business and Professions Code section 17201.

20.     All of the conduct that forms the basis for this First Amended Complaint has been undertaken by Defendants by and through their agents, employees, officers, or others acting on their behalf.

## III.     JURISDICTION AND VENUE

21.     This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class embers exceed $5 million, exclusive of interests and costs, and at least one member of the proposed Class is a citizen of a different state than Grand Canyon.

22.     This action is also brought by Plaintiff pursuant, *inter alia*, to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction here and regularly conduct business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

24.     As set forth in more detail throughout this First Amended Complaint, including in Paragraphs , the injuries, damages, and/or harm upon which this action is based, occurred, or arose out of activities engaged in by Defendants that were knowingly and intentionally directed towards

consumers in the state of California and around the nation, including within, affecting, and emanating from various municipalities within the jurisdiction of this District, including the cities of Fresno and Sacramento.

25.     As set forth in more detail throughout this First Amended Complaint, including in Paragraphs 39, 41, 55, 61, 64, 79, 91-93, 96-100, 105, 112-21, 125, 128-45, 169-72, 174-89, 96, 202, Defendants have sufficient minimum contacts with California and intentionally avail themselves of the consumers and markets within the California through the promotion, marketing, and sale of educational programs to tens of thousands of citizens in California.  They also employ many instructors and administrators in the state and hold substantial conferences in the state several times each year. each of the Defendants has engaged, and continues to engage, in substantial and continuous business practices in California, including the acts alleged herein. This purposeful availment renders the exercise of general jurisdiction by California courts over Defendants permissible under judicially accepted notions of fair play and substantial justice.

26.     Defendants are engaged in a multi-state criminal enterprise with the purpose of defrauding Plaintiff in California as well as Class Members across the United States. It is necessary to bring all of the participants in this enterprise before a single court in a single trial, in furtherance of the ends of justice.

27.     To the extent that this Court does not have personal jurisdiction over any defendant in this action under the California long-arm statute, it has personal jurisdiction over that defendant pursuant to 18 U.S.C. § 1965.

IV.     **FACTUAL ALLEGATIONS**

    A.     **Overview of the Enterprise.**

28.     Defendants are corporate entities and individuals working in the for-profit higher education industry who have created an associated-in-fact enterprise with each other. Defendants designed and operate the enterprise to defraud students, by diverting funds students pay to attend the University to GCE and themselves, including each of the Individual Defendants, without providing the

promised education to graduate students seeking to work in Regulated Professions. Defendants train and incentivize their recruiters to mislead students interested in graduate programs that will prepare them for professional employment, including the ability to work in Regulated Professions, into enrolling while omitting material information regarding the programs' accreditation, all the while knowing that many of the programs do not in fact meet the necessary licensing standards.

29.     Defendants engage in this conduct to enrich themselves and the shareholders of GCE (which include the Individual Defendants). In recent years, Defendants have undergone some restructuring. Indeed, as explained in more detail herein, during the Class period Defendants have organized themselves in two different ways to evade federal regulations that would place limitations on their ability to defraud students. Until approximately July 2018, Defendant GCE, a publicly traded entity, operated the University as a for-profit institution. Since approximately July 2018, Defendant Grand Canyon operated the University as a non-profit institution, but began to outsource certain aspects of its operations to Defendant GCE. As part of this restructuring of the enterprise, the Grand Canyon University Foundation (also led by Defendant Mueller) became the sole member of Grand Canyon. These organizational changes were done at the direction and oversight of the Individual Defendants, who, at all times, controlled GCE and the University.

30.     Notwithstanding the restructuring, the University and the pattern of omissions and misrepresentations have remained unchanged over the course of the Class period.

**B.     Defendants took control of the University, structuring themselves and the University to further a fraudulent education scheme.**

31.     In 2004, the University was operated as a small, freestanding, Christian non-profit corporation with a small brick and mortar campus in Arizona and an enrollment of approximately 1,000. It was operated by various trustees who later terminated their affiliation. At that time, the University had regional accreditation, which is required to participate in the Department of Education federal student loan program. But when the University faced closure, it was sold to what is now GCE, a for-profit company.

32.     For a new college or university to obtain that accreditation, the process could take as long as five to seven years, but by buying an existing university and flipping it into a for-profit, the accreditation automatically transferred without delay. This enabled GCE to immediately receive (and profit) from federal student loan program funding.

33.     GCE began to transform the small Christian University by immediately shifting focus away from serving students and toward making a profit. In fact, GCE started referring to the University's colleges as "cost centers," and referring to faculty members as "MLs", short for money-losers.

34.     Then, in 2008, new investors—with a documented history of using for-profit online colleges to effect fraudulent schemes—were brought in to increase profitability by developing online programs and taking GCE public. These new investors, including all of the Individual Defendants, were from the Apollo Group, which also ran the University of Phoenix, a for-profit online college. Under the leadership of the Individual Defendants, the Apollo Group had been sued and investigated numerous times in association with its operation of the for-profit school University of Phoenix. For example, federal regulators charged University of Phoenix with engaging in the illegal practice of tying recruiters' pay to enrollment numbers, which created pressure to sign up unqualified students. And Defendant Bachus, who served as the Chief Accounting Officer of the Apollo Group, was forced to resign in 2006 from that role after an investigation determined that he and others affiliated with the University of Phoenix were improperly awarding stock options in the Apollo Group to certain key employees. This misconduct resulted in one of several class action lawsuits against the school, with others filed by students alleging fraud and deceptive advertising.

35.     Notwithstanding the fact that Defendant Mueller had overseen and approved extensive fraud at the University of Phoenix, the investors running GCE hired him as President and CEO of GCE, and put him in charge of running the University.

36.     Defendant Mueller then reassembled his team from the Apollo Group. He hired Defendant Bachus even though Defendant Bachus had committed option fraud and was forced to

resign from his role as Chief Accounting Officer at the University of Phoenix, and even though, for the two years after his resignation, he drove a real estate business into bankruptcy, defrauding consumers in the process.

37.     To complete the team, Defendant Mueller hired Defendant Meyer as his Chief Operating Officer. Defendant Meyer too had worked for Apollo Group, holding the same title. In that role there, Defendant Meyer would have been responsible for overseeing things such as the fraudulent recruitment process that resulted from University of Phoenix's illegal compensation policies, which caused it to incur massive fines from the Department of Education ("DOE").

38.     After the Individual Defendants, by and through GCE, assumed control of the University's operations, they fired nearly two dozen professors and tenured faculty members. And thus the Individual Defendants immediately began operating toward the central goal of their control for years to come—reducing expenditures on education and academics to shore up their own profitability.[1]

39.     Already experienced in defrauding online students, Defendants GCE and the Individual Defendants added an online program to the University's offerings, and the school grew rapidly, primarily via the aggressive marketing and recruitment efforts, as described in more detail in Paragraphs 92-145. This online program would become the centerpiece of Defendants' graduate programs. Because students who enroll in an online program do not need to be located in geographic proximity to Arizonaa, GCE and the Individual Defendants decided to operate an online program because they intended to reach graduate students around the country, including California. In so doing, they would not be limited to enrolling only those students who wished to travel to Arizona, but instead, could enroll students who were living in any state, including California, which would create new opportunities to grow their profits.

40.     In 2008, shortly after GCE hired the Individual Defendants, the Individual Defendants arranged for GCE to go public. Since that time, GCE has been a publicly traded company and each of

---

[1]   https://www.phoenixnewtimes.com/news/divergent-views-of-for-profit-grand-canyon-university-9705013

the Individual Defendants have held large numbers of shares of stock in GCE, personally profiting from everything it does.

41.     Running the University as a for-profit endeavor, Defendants were able to expand operations from 1,000 students in Arizona in 2008 to over 100,000 students from around the country, including California. During this period of rapid expansion, spending on academics did not keep pace with the growth of the program, which was Defendants' intent. Instead of using tuition dollars to invest in academics, GCE and the Individual Defendants invested heavily in recruiting, building a continuous enrollment pipeline, while offering little to students in return. As detailed herein, GCE and the Individual Defendants oversaw the building of this recruiting pipeline, which included directing and overseeing the presence of staff from GCE and Grand Canyon in California and around the country. And as the online program expanded rapidly, Defendants were able to enroll tens of thousands of graduate students, including hundreds or more from California, despite not offering the requisite accredited programs for these students to become licensed. As detailed herein, Defendants accomplished this feat through fraud and a deceptive enrollment and recruiting scheme, using many of the same illegal tactics the Individual Defendants used while running University of Phoenix. The goal from the onset was to defraud students.

> **1.      The recent history of the for-profit education industry is dominated by fraud and increasing regulatory efforts to manage it.**

42.     Institutions offering higher education programs may be set up as either for-profit businesses or non-profits under IRS code 501(c)(3).

43.     Non-profit institutions are exempt from paying federal income tax, but must have a charitable mission into which the money flows. To ensure that funds being spent go to further the charitable mission of the institution, it is generally accepted that non-profit organizations should adhere to two principles. First, non-profit organizations are typically overseen by unpaid trustees or a board of directors so their decision making is not conflicted by a financial interest. And second, because the

"profits" earned after paying expenses do not get taxed, it is expected that they will be reinvested into the organization in furtherance of the mission.

44.     On the other hand, because for-profit institutions are typically overseen by people with a financial interest in the business, such as shareholders or owners, the motivation is invariably to generate profits. Indeed, "profits" become priority because they can be paid out to investors to entice them to continue to invest or they can be used to reinvest into revenue streams that will benefit them.

45.     While nearly all for-profit companies in this country earn money through legitimate business, for-profit higher education does not operate under normal free market pressures. Accordingly, the incentive for fraud is well documented. Whereas a traditional for-profit business must deliver on its promises or suffer financial consequences, such as a cancellation of services or a return of the goods for a refund, for-profit educational institutions are immune to those consequences for two reasons. First, the material factor that motivates students to enroll and pay money (or take on debt) is a degree that will position them to engage in their chosen profession. Thus, the benefit from the "purchase" does not accrue until long after money has changed hands and work has been performed, and a person does not know if a degree can secure employment until after they have paid for months or years of schooling. Second, the school does not experience any normal free market consequences from false advertising or fraud. Months or years pass in between the full amount of tuition being paid and the student's discovery of the fraud, during which point the school continues to enroll and receive money from new victims. And the defrauded student cannot "return" their education in the traditional sense when they realize the degree is not what was advertised. Finally, students typically pay for tuition using federal student loans, for which the school is not responsible for repaying pursuant to the ordinary terms of the loan. Rather, when a school does not provide the promised academic and professional training, the student still must repay the loans, even if they cannot obtain employment. If the student defaults on the loan, there are limited avenues to have the debt discharged, but even if the student is able to meet the high burden to do so, the government forgives the debt, and the school

retains its profits. Thus, if students default on their loan as a result of the fraud, it is not the school that is on the hook, but rather, the taxpayers.

46.     Not surprisingly, numerous for-profit schools have succumbed to the temptation to engage in misrepresentations and other fraudulent tactics to drive up enrollment and in turn profits. Rather than invest profits into the educational mission, these schools find it easy to simply divert money from educational programs and into the pockets of the investors. Students who attend find themselves left with worthless degrees, no job prospects, and massive amounts of student loan debt that cannot be repaid. And taxpayers are forced to subsidize the student loan defaults that were brought on by misleading representations to students and low-quality instruction. In fact, while only 11% of college students attend a for-profit, they account for 44% of federal student loan defaults.[2]

47.     The fraud perpetrated by the Individual Defendants while at the University of Phoenix is not the only fraudulent scheme conducted with a for-profit college that has been the subject of a lawsuit—nearly every large for-profit school has been sued for defrauding students.

48.     Long after Individual Defendants left the University of Phoenix, that institution had to pay a record $191 million to the Federal Trade Commission over its deceptive advertising practices. Another massive for-profit university, Corinthian Colleges, was sued by 20 state attorneys general as well as by a number of students in various class action lawsuits and was fined $30 million by the DOE. It filed for bankruptcy in 2015. ITT Tech, another massive for-profit school, settled with the Consumer Financial Protection Bureau for $60 million, and with 43 state attorneys general for $168 million. DeVry University, another for-profit school that had enrolled tens of thousands of students around the country, settled false advertising claims brought by the Federal Trade Commission for $49 million.

49.     Even small for-profit schools repeatedly get sued for defrauding students. Herguan College in Sunnydale, California was shut down and its Chief Executive Officer went to prison for

---

[2] https://www.ed.gov/news/press-releases/fact-sheet-obama-administration-increases-accountability-low-performing-profit-institutions

fraudulently enrolling international students into sham educational programs. Daymar College, National College, and Spencerian College were sued by the Kentucky Attorney General in 2011 and 2013. Lincoln Technical Institute and Salter College settled with the Massachusetts Attorney General. Daymar College also settled fraud claims brought by the Pennsylvania Attorney General.

50.     Because the costs of fraud are born by students and taxpayers, Defendants were more easily able to defraud students over a longer period of time than they would if they themselves bore the costs. In particular, Defendants know that if they pressure students into enrollment and withhold material information regarding employment prospects and suitability of the program to work in desired fields, and especially Regulated Professions, students will enroll and only discover the fraud long after Defendants have received the money borrowed by students from the federal student loan program. Accordingly, Defendants set out to defraud students and built the University and recruiting processes to do just that. Eventually lawsuits and the DOE began to bear down on for-profit colleges and, as a result, savvy profiteers like Defendants were forced to devise a legal mechanism to avoid scrutiny while not harming GCE's bottom line. Of course, all the while the Individual Defendants continued their scheme to trick students into paying for useless coursework that would not prepare or qualify them to work in Regulated Professions.

### 2. To avoid complying with federal disclosure requirements imposed on for-profits, Defendants sought to convert to non-profit status.

#### a. Increasingly, for-profit schools have been seeking to convert to non-profit status.

51.     In response to the fact that so many for-profit institutions were defrauding students and taxpayers, the DOE began looking for ways to better regulate the for-profit institutions that wished to participate in the federal student loan program. In 2014, several new regulations designed to curb the worst abuses of for-profit schools were passed. One such rule, the "Gainful Employment Rule," codified at 34 C.F.R. § 668.403, is particularly notable. That rule requires programs that prepare students for gainful employment in a recognized occupation, which include Regulated Fields, to

comply with certain disclosure requirements to better inform prospective students as to the likelihood they will obtain gainful employment in their field. The rule applies to for-profit career programs, as well as certain kinds of certificate programs at non-profit institutions, like community colleges.

52.     Many for-profit institutions did not respond by increasing transparency, but instead began engaging in another form of deceit to get around compliance. In the last few years, more than a dozen for-profit schools, which collectively enroll hundreds of thousands of students, have begun the process of converting to non-profit institutions. But to ensure that they are able to still profit handsomely while engaging in the same misrepresentations, they restructure their operations in such a way to ensure profits from students and their federal student loans still flow to financially interested people. Under these schemes, the school is typically put under the management of a non-profit corporation, which then outsources its work to the original for-profit entity, which charges steep markups to provide "educational services." Through the use of shell companies, the same people typically wind up controlling both the for-profit educational services corporation and the non-profit school. The only difference is that by structuring themselves in this way, the school can continue to omit truthful and material disclosures about the suitability of its programs for employment, ensuring they can still profit from offering sham educational programs.

53.     Converting to a non-profit has another advantage: because for-profit universities are increasingly known to be riddled with fraud, being able to market a university as a "non-profit" is advantageous to driving enrollment. But of course, running an actual non-profit comes at a cost: profits need to be reinvested in the school and its educational mission, rather than paid out to shareholders or in the form of exorbitant executive salaries that are not subject to independent oversight.

54.     The IRS is responsible for determining whether an institution is a non-profit or a for-profit, and it typically relies on an honor system, or at most, an audit conducted years later. There are more than 1.6 million non-profit organizations in the United States, and the IRS does not have the staffing or budget to undertake a thorough and meaningful evaluation of each one at any point, let alone on any sort of regular basis. But because for-profit schools have recently been trying to convert

to non-profit schools to evade oversight while still profiting, the DOE has begun undertaking scrutiny into applications to become non-profits. As a result, a school could be a non-profit in the eyes of the IRS, but a for-profit subject to the DOE for-profit regulations.

      **b.**     **Defendants transfer the University to a non-profit, while retaining all control and diverting tuition revenue to the for-profit GCE.**

55.     By 2014, using the recruiting tactics described in Paragraphs 92-145, Defendants had enrolled 15,000 students to attend school at the University's Arizona Campus, and another 60,000 students to attend school online, which alone was generating $210 million in operating revenue. Defendants enrolled students from the entire country, including thousands from California, charging them tuition, accepting tuition dollars from each. But in response to the changing regulatory world, Defendants began to undertake a plan to restructure themselves as a non-profit. The Individual Defendants and GCE began to develop a plan to create a non-profit organization to which the University would be transferred, but that would also divert revenues back to GCE, and in turn, to the Individual Defendants. Like the other dozen or so for-profit to non-profit conversions, the Individual Defendants and GCE intended for the University to be run by a non-profit that would serve as the front for the University, but that would also maintain a cash flow that was unburdened by those regulations. In so doing, Defendants would be able to continue to mislead graduate students into enrolling in their programs, which were not accredited for practice in Regulated Professions.

56.     After developing the plan, Defendants petitioned the University's regional accreditor, the Higher Learning Commission ("HLC"), to approve a plan by which the University would be transferred to a new non-profit organization, and that GCE would be a "services corporation," which would provide services to the non-profit school. HLC denied the request because of concerns over the whether the new non-profit would be sufficiently independent from the financially motivated GCE.

57.     By 2018, Defendants re-petitioned HLC, and this time, HLC approved Defendants' plan to switch the University to non-profit status. The approved plan, however, was suspect; Defendants would still be outsourcing operations and transferring most of the non-profit revenues to

the for-profit. And with HLC's approval, Defendants had again maneuvered their way into regional accreditation—a requirement for the new non-profit owner of the University to participate in the federal student loan program.

58.     Although HLC approved Defendants' outward plan to be a non-profit with services provided by GCE, Defendants intentionally did not create an independent non-profit entity.

59.     Central to Defendants new plan was a July 1, 2018 Asset Purchase Agreement ("Purchase Agreement") pursuant to which GCE sold the University assets to an entity known as Gazelle University (the "Transaction"). Immediately after the Transaction was finalized, Gazelle University changed its name to Grand Canyon University and Defendants petitioned the Department of Education to recognize Grand Canyon as a non-profit institution using interstate wire and mail, the specifics of which are in the exclusive control of Defendants and the DOE.

60.     GCE and Individual Defendants never intended to operate the new non-profit entity— Defendant Grand Canyon (f/k/a Gazelle University)—as an independent non-profit entity. Rather, Defendants formed it shortly before the Purchase Agreement was entered, with each intending to make it appear as if the University was under non-profit control, while structuring things to ensure that Defendants could still reap the same profits as they had been while operating a for-profit.

61.     Defendants structured the agreement to ensure that Grand Canyon's assets, including its revenue stream, which included hundreds of thousands of tuition dollars paid by California students in response to their recruiting efforts, were under the control of GCE and the Individual Defendants at all times.

62.     First, Defendants agreed that outside oversight of the new non-profit, Grand Canyon, was not desirable, as it may have impeded the other sham terms of the Purchase Agreement, described below. Thus, to make Grand Canyon appear independent, Defendants decided that the sole member of Grand Canyon should be the Grand Canyon University Foundation, and not any paid officers or directors of GCE. But Defendant Mueller, who would both retain his role as Chair of GCE and also

serve as President of Grand Canyon, was the sole member of the Foundation, and thus, this oversight was a sham from the beginning. Each Defendant approved this arrangement.

63.     Second, Defendants structured the arrangement so that Grand Canyon was not financially independent, but rather, would be legally bound to transfer its funds to GCE, and in turn, the Individual Defendants. Under the terms of the Purchase Agreement, Grand Canyon had to pay to acquire the University, but since it was newly formed, it had no assets. To secure the assets, Grand Canyon would make monthly payments to GCE for those assets pursuant to a note and credit agreement. That note and credit agreement was secured with a lien on the University assets, thus despite holding Grand Canyon out as the entity that controlled the University, GCE still has an ownership interest in all of its assets.

64.     The Individual Defendants and GCE still needed to maintain a revenue stream, however, because under the new arrangement, the primary source of revenue, tuition, would be paid to Grand Canyon. To transfer those revenues out of Grand Canyon and into GCE and the Individual Defendants pockets, Defendants entered into a Master Service Agreement, under which GCE would provide services to Grand Canyon (f/k/a Gazelle), which in turn would pay to GCE a portion of its revenues ("Master Service Agreement"). The Master Service Agreement mandates that Grand Canyon "outsource" a variety of services to GCE. For example, Defendants agreed that Grand Canyon would outsource marketing, recruitment, enrollment services, student support and counseling, and technology. Thus, Grand Canyon would provide the academic instruction and be the entity receiving tuition dollars, obtained by students, including those in California, from the federal student loan program. It would then pay GCE those tuition dollars to perform various services, including most importantly, conducting the marketing and recruiting of new students from around the country, including California, to enroll.

65.     The Master Service Agreement however was nothing but a way to ensure that profits flowed to GCE and the Individual Defendants, instead of staying with Grand Canyon to be invested in the charitable, educational mission of the non-profit Grand Canyon University. Defendants designed

the Master Services Agreement to designate GCE as the exclusive provider of these services, and included a provision stating that if Grand Canyon wanted to contract with a third party for any service, it must not only obtain GCE's approval, but it will still be required to pay GCE its fee for those services. Defendants further agreed that Grand Canyon would pay GCE not at market rate for any services rendered, but rather, a flat fee of 60% of Grand Canyon's revenue from tuition and fees (including fees assessed on students for activities and the use of the online communications portal), net of refunds and scholarships. The fee however is exclusive of taxes; in other words, Grand Canyon must pay taxes imposed on the cost value, or price of services provided. The fee rate is only subject to review at ten-year intervals and can only be cancelled after the original note used to acquire the University assets is paid off.

66.     The master Service Agreement was further designed to shield the for-profit GCE and the Individual Defendants from liability, while trying to limit the recovery available to defrauded students. In particular, it caps GCE's liability for any claim to the amount paid by Grand Canyon to GCE in the preceding three-month period. This liability protection was added because GCE and the Individual Defendants anticipated that it was likely that that Grand Canyon would be sued in connection with its fraudulent services. They knew that the massive fees paid to GCE resulted in Grand Canyon being undercapitalized, and they desired to protect their profits.

>          c.     **Defendants' scheme to create a new non-profit school while outsourcing services to GCE did not survive scrutiny from the DOE.**

67.     In 2018, after HLC approved Defendants' plan to have GCE provide "educational services" in exchange for revenue, Defendants petitioned the DOE to recognize Grand Canyon as a non-profit, which would ensure that Grand Canyon would not have to comply with additional regulations designed to protect students from being defrauded by for-profit universities.

68.     The DOE took a long time to review Defendants' request, and on November 6, 2019, it denied Defendants' request to treat Grand Canyon as a non-profit. While the DOE had approved many similar plans by other for-profits to convert to non-profits, Defendants' plan was uniquely

troubling to the DOE.  It based its decision to deny Defendants' request to be treated as a non-profit on a number of factors.

69.     First, the DOE took issue with the fact that Grand Canyon was not technically owned or operated by a non-profit association and its net earnings benefited private shareholders and individuals in violation of section 101(a)(4) of the Higher Education Action, 20 U.S.C. § 1001(a)(4). In so holding, the DOE considered that the relevant standard was whether the for-profit entity was organized to benefit substantially from the operation of the non-profit entity. It concluded that "the primary purpose of the MSA, and by extension, the Transaction, was to drive shareholder value for GCE with GCU as its captive client – potentially in perpetuity." *See* Exhibit A.

70.     Second, the DOE was troubled by the sham nature of the Master Service Agreement. To support their application, Defendants retained Barclays to perform a study. The DOE scrutinized that study more closely than Defendants had anticipated. In particular, the DOE took issue with statements in the Barclays report about how, when GCE owned and operated the University, the costs of operating the University were roughly $810 million a year. But after the Transaction, the costs of operating the University would increase to $1.496 billion a year. That cost increase was not because GCE would be providing more services under the master Service Agreement than it performed while the University was under its direct control. Rather, the DOE observed that the Master Services Agreement would have the non-profit Grand Canyon covering some operating costs that GCE handled previously, such as the cost of academic instruction and maintenance of physical property, and that GCE was simply charging a massive markup on a smaller number of services that Grand Canyon would be required to outsource to GCE. In other words, GCE would cover 28% of the responsibilities of running a university but receive 60% of the gross adjusted revenue.

71.     The DOE further noted that the 85% increase in operating costs estimate was based on conservative estimates. In particular, it noted that the actual markup would likely be much higher, given that the Barclays report had underestimated revenue. The DOE estimated that after GCU's payments on the note factored into the equation, 95% of its adjusted gross revenue would be paid to GCE,

leaving just 5% of total revenue to cover the remaining 72% of expenses required to actually run the University. Most notably, teacher and professor salaries, which are typically the highest line item for a university, would have to be paid out of the 5% revenue that GCE did not collect. In contrast, the DOE has observed that the cost of instruction from professors and faculty at private four-year non-profit universities averages about 32% of a budget.[3] Because Defendants would not have designed an agreement that would have bankrupted Grand Canyon, it suggests that prior to the Master Service Agreement, GCE was spending a similar level of revenue on academics when it maintained direct control of the University. Ultimately, Defendants' own study effectively revealed how the Master Service Agreement is designed to transfer assets away from the charitable purpose of the non-profit Grand Canyon and into the pockets of GCE, Defendant Mueller, the other Individual Defendants, and investors.

72.     The DOE went on to note that, by GCE's own admission, its shareholders "retain ownership of GCE cash flows," which it found problematic given that GCE's primary (or perhaps sole) source of revenue was what it generated from the non-profit Grand Canyon. DOE noted that in minutes from GCE board meetings, Defendant Bachus described the creation of Grand Canyon as one that would benefit stockholders of GCE. The Individual Defendants are included among those stockholders.

73.     DOE also took issue with Defendant Mueller's dual roles. While Grand Canyon informed DOE that the boards of GCE and Grand Canyon made "independent decisions" to hire Defendant Mueller to lead both entities, the sold member of Grand Canyon is an entity controlled by Defendant Mueller. In other words, Defendant Mueller decided he should be hired to run Grand Canyon while deciding not to resign from GCE. The DOE found he possessed "obvious conflicting loyalties" to running the for-profit GCE while at the same time ensuring the charitable mission of Grand Canyon.

---

[3] https://nces.ed.gov/fastfacts/display.asp?id=75

74.     The DOE further took issue with the roles played by the other Individual Defendants. In particular, it noted the obvious conflict with the fact that 75% of Grand Canyon's executive leadership and oversight committee were employed by GCE as executives, and thus had a duty to maximize shareholder value of GCE, whose sole revenues were derived from the non-profit they were supposedly overseeing to ensure a furtherance of its charitable mission.  Thus because of this structure, the DOE determined that Grand Canyon was not actually operating itself, but rather was under the control of GCE and those, including the Individual Defendants, who controlled it.

75.     While the DOE took no position on the IRS classification of Grand Canyon as a non-profit, the DOE denied GCE non-profit recognition and instructed it not to refer to itself as a "non-profit" institution, holding that the representation is "confusing to students and the public." It further noted that Grand Canyon must comply with all federal regulations governing for-profit entities, including those set forth at 34 C.F.R. § 668.28 and 34 C.F.R. Subpart Q.

76.     While Defendants must continue to comply with DOE for-profit regulations in the operation of the University, Defendants are no doubt revisiting their arrangement to attempt to rearrange how assets are structured to get out from underneath the weight of the for-profit regulations to permit them to engage in misleading advertising. And the ongoing existence of the Master Service Agreement reveals the extent to which Defendants are intentionally transferring resources out of Grand Canyon, which still must abide by IRS rules to reinvest in its educational mission non-profit school, and into GCE to enrich themselves.

C.     **Defendants operate the University in such a way so as to ensure that students who attend are defrauded.**

1.     **Overview of Regulated Professions Accreditation.**

77.     To participate in the federal student loan program, a university must have accreditation from a regional accreditation agency, and the University obtained its regional accreditation, first by transition from the original non-profit Christian school, and then from HLC when it propped up a

non-profit in front of GCE, which Defendants said would provide "services" but that would actually provide them profits.

78.     Beyond regional accreditation, educational institutions and their programs are often required to be accredited by various specialized accreditation programs. For example, many states require those desiring to work in certain Regulated Professions to obtain their education from a school or program that has been specially accredited to provide education for that purpose.

79.     The standards for professional accreditation vary based on the nature of the program and the state laws at issue. Typically, however, states that require a person to obtain a graduate degree from a professionally accredited school before practicing in a Regulated Profession will require that degree program to include coursework in certain topics, meet various academic standards, and sometimes, include a practical component, such as an internship or other supervised professional experience in the field. Most notably, graduate degrees in education and healthcare are not accepted by employers or California governmental entities (such as school systems or state professional standards boards) unless accredited for that purpose.

80.     Moreover, the process of obtaining and maintaining professional accreditation of a program can be time consuming and expensive. Different states may have different standards for a given Regulated Profession, and a school that wishes to prepare people to work in a variety of different jurisdictions will need to invest in ensuring their programs meet any differing standards. Moreover, to ensure the student will be able to practice in the Regulated Profession after graduation, schools also need to ensure adequate academic and career counseling is available to students to properly advise them on course selection and to help students identify and complete all the various academic and practical requirements to be met before graduation.

81.     Because a degree from a school offering a program that has been professionally accredited in the state in which the student desires to work is an essential prerequisite to working in certain Regulated Professions, no student desiring to work in a Regulated Profession in a certain state would ever knowingly enroll in a degree program that was not professionally accredited for purposes

of practicing there. There is no inherent value in a degree program that purports to prepare a person for a Regulated Profession but is not in fact accredited for that purpose.

> **2.** **Because Defendants divert tuition dollars into shareholder profits, they cannot offer educational programs that are professionally accredited in all jurisdictions.**

82. To maintain its high level of profitability, Defendants simply cannot devote the level of resources which are required to obtain accreditation in many fields.

83. For example, the University's online professors are generally not paid enough and, thus, it is not their full-time job. In addition to low pay, Grand Canyon and GCE also offer no benefits to the vast majority of instructors, such as no possibility for tenure, no pension or 401(k) matching, and no health insurance coverage. Faculty quality understandably suffers as a result. At one point, the University revealed that faculty compensation is approximately 15% of tuition revenue, less than half as much as private four year institutions, which spend an average of 32% of tuition revenue on instructor compensation.[4] That percentage is lower now, because the Master Service Agreement only leaves GCU with 5% of tuition revenue to cover expenses, of which academics is only one part, and tuition revenue increases every year without commensurate increases in staffing. University instructors generally work another job (or multiple other jobs) and teach at the University "on the side." Most of them do not acknowledge their work as a Grand Canyon "professor" on their résumés or LinkedIn pages.

84. As a result of the low pay and need for other full-time employment, University faculty are not able to complete the tasks expected of faculty by many accrediting agencies, such as: preparation of proper course outlines and materials; delivering tailored lectures and answering student questions; and assisting students with the material at regularly-scheduled times. As must be expected based on the University's low expenditure on faculty, the school is not able to hire and retain excellent professors.

---

[4] https://nces.ed.gov/fastfacts/display.asp?id=75

85.     Because Defendants have directed tuition and revenues into their pockets and instead of to the educational mission of the University, they are unable to provide students and faculty with the level of resources deemed essential by many accrediting agencies. In addition to poor faculty pay, and negligible benefits, training and support does not meet minimum standards. Class materials are also substandard, often amounting to links to Internet-based websites and information. "Hands on" work is impossible or, at the very least, much less of an emphasis than in most accredited programs.

86.     Testing and other performance evaluations are not reputable at the University. Many students complain that grading in courses is random with the main emphasis on keeping students at the University, even when they do not show knowledge of the coursework. This is driven in large part by the compensation incentives given to counselors to keep students enrolled, as described in Paragraph 102-112.

87.     To increase the amount of tuition revenues that Defendants receive, they enroll students without regard to whether they have the requisite level of educational background to meet standards established by most accrediting agencies. The University accepts nearly every student. Many students enroll in graduate programs without basic language skills. But Defendants have agreed not to invest money into offering remedial programs to help these students get "up to speed," choosing instead to profit while pushing the students through academic programs for which they are not qualified. Accrediting agencies are well aware that the level of student preparation is below standard and that even those students who are capable of excelling cannot benefit from interaction with other similar students.

88.     For these and numerous other reasons, accrediting agencies justifiably have not accredited many University professional degree and certificate programs and do not accept Grand Canyon degrees or coursework.

89.     Without the form of accreditation required to qualify the students for licensure and/or practice in Regulated Professions, the University's online degree programs are worthless to students in these fields. The largest group of online students are in the education field. Teachers and other

education professionals seek graduate degrees in order to increase their pay and improve their chances for promotions. In California (and in every other state), however, these degree programs must be accredited. Otherwise, "diploma mills" will simply issue degrees and teachers will obtain unearned benefits. Most of the University's educational master's and doctorate programs are not accredited to qualify the students to practice in Regulated Professions in California or most other states. Admittedly, some University programs are generally accredited in Arizona and are sometimes accredited in other states. But no California teacher seeking a graduate degree in education would ever knowingly invest time or money (or indebtedness) into an unaccredited University program of study as it could not prepare them for employment in their desired field. None of the benefits they are seeking from the degree are available to them, whereas they could just as well take classes from dozens of accredited programs.

90.    The same is true in the University's second largest field of online graduate study, healthcare. For obvious reasons, California (and all other states) require healthcare professionals to have graduated from reputable and accredited programs before beginning certain professions in healthcare, including therapists, counselors, nurses, technicians, and even physicians and dental assistants. Most of the University's healthcare degree programs are not accredited in California or most other states. As such, no California resident would ever knowingly invest time or money (or indebtedness) into such an unaccredited Grand Canyon program of study.

91.    Defendants know that Plaintiff and other Class members would not knowingly sign up for unaccredited professional programs. Defendants also know that many states, and in particular California, have set high standards for those seeking to work in Regulated Professions. Defendants however want to market to students in populous states such as California to increase their profits. But because Defendants know that their degree programs are not suitable for work in California and other states, they must rely on trickery and lies of omission. Defendants intentionally and improperly failed to disclose the truth in order to induce Plaintiff and other Class members to enroll. Such conduct is obviously unethical and improper but it is also illegal. The federal government prohibits Grand Canyon

(and any other school receiving federal funds) from engaging in "substantial misrepresentations." As conceded in Grand Canyon's Annual Report, the DOE "has defined a misrepresentation as any statement made by the institution or a third party that provides educational programs, marketing, advertising, recruiting, or admissions services to the institution that is false, erroneous or has the likelihood or tendency to deceive." Such statements can pertain to "its educational program, its financial charges, or the employability of its graduates." Defendants concede "we are subject to this regulation."

> **3. Defendants use aggressive marketing tactics to enroll students into programs for Regulated Professions without regard to whether the program is appropriate for them.**

92. Currently an estimated 100,000 students, more than 80,000 of which based around the country, including California, are enrolled in online programs through the University, making just the online program one of the largest schools in the country. By comparison, the University of California at Berkeley has a total undergraduate and graduate enrollment of about 44,000 students.

93. Defendants know that routine advertising and recruiting akin to what ordinary non-profit universities do will not attract enough students to maintain high levels of enrollment, and accordingly, high levels of profits. To ensure a pipeline of incoming students so that tuition dollars continues to grow and deliver financial rewards to GCE's shareholders, including the Individual Defendants, Defendants have devised a comprehensive, nationwide marketing and recruiting program that relies on high pressure, deceptive sales tactics to trick students into enrolling, without regard to their qualifications or educational needs, and without regard to whether the programs are suitable for practicing in Regulated Professions in a given geographic area. Because Defendants know that their programs are not accredited or suitable for work in Regulated Professions in states such as California, Defendants have knowingly and intentionally designed their marketing and recruiting program to entice out of state students, and in particular, California students, to enroll to increase their profits. This

marketing and recruitment program has been under the control of GCE for the entire Class period, and accordingly, is operated under the direction and oversight of the three Individual Defendants

94.     As described herein, Defendants' recruiting practices go beyond acceptable marketing practices and veer into highly deceptive tactics. Indeed, in 2012 a report from a Senate investigation led by former Senator Tom Harkin noted that Grand Canyon had "an aggressive recruiting posture," and criticized the way in which Counselors and Advisors "were encouraged to create a sense of urgency" and were trained to "uncover prospective students' pain and pleasure points." The report also expressed concern over Defendants' aggressive and well-developed sales techniques that were designed to psychologically motivate students to attend.[5]

95.     To carry out their marketing efforts, Defendants have devoted enormous sums of money to advertising and marketing—at least 13% of its revenues go to that purpose. Indeed, in GCE's 2018 annual report, GCE made plain that while it was increasing its marketing spending by millions, it was paying off in spades—constituting a smaller percentage of net revenue:

> Our marketing and communication expenses for the year ended December 31, 2018 were $117.4 million, an increase of $8.3 million, or 7.6%, as compared to marketing and communication expenses of $109.1 million for the year ended December 31, 2017. This increase is primarily the result of increased advertising costs of $7.9 million, and other communication expenses of $0.4 million. Our marketing and communication expenses as a percentage of as adjusted net revenue decreased by 0.4% to 18.3% for the year ended December 31, 2018, from 18.7% for the year ended December 31, 2017.

2018 Annual Report, p. 53.  By 2019, the amount spent on just online marketing exceeded $60 million per year.

96.     Defendants have organized a team of GCE officers and employees, who Defendants supervise in their recruitment out of its offices in Phoenix, Arizona, including Shawna Barnett (Executive Director of Digital Marketing) and Brad Reifschneider (Assistant Director of Digital Marketing).  The team's budget exceeds $60,000,000 annually and results in over 70,000 potential

---

[5] https://www.documentcloud.org/documents/4056295-HarkinReport-GCU.html#document/p10/a376549

student "leads" each month. Mr. Reifschneider's job responsibilities including spending money on third-party aggregators and paid search advertisements, expand new campaigns, manage and optimize campaigns through Google, Bing, and Facebook, all based in California, and conduct data analysis. He develops approximately 70,000 monthly leads, i.e. prospective students for Defendants to contact to sell enrollment in degree programs from the University.

97.     With the approval of all Defendants, GCE directs its marketing team in Arizona to direct online internet ads to potential students that search online for accredited programs, including potential students in California. But to ensure the broadest reach possible, GCE pays Google and other search engines and online advertising platforms to have the University listed at the top of the search results, even for those searches which Defendants know the University cannot provide a degree suitable for work in the searcher's state, such as California.. Defendants instruct that these misleading search results and misrepresentative web sites and web pages be presented to potential students via interstate wire transmissions from Arizona, through the search engines' servers, including Google's in California, to Class members around the country.

98.     As a result of these expansive advertising efforts, Defendants' advertising reaches people in California and in this District on a daily basis. As California represents approximately 12 percent of the population, Defendants contact approximately 8,400 Californians each month with at least one phone call and sometimes multiple calls, resulting in hundreds of thousands of phone calls, placed over interstate wires, each year.

99.     To market to students interested in working in Regulated Professions, whom Defendants know accreditation for that purpose is material, under the approval of all Defendants, GCE's marketing team publishes in various places a disclosure about its regional accreditation, to which they direct students who inquire about professional accreditation. That statement falsely suggests that the professional programs are fully accredited:

**Accreditation**
The Higher Learning Commission and its predecessor have continually accredited Grand Canyon University since 1968, obtaining its most recent ten-year reaccreditation in 2007. In addition, the university has obtained specialized accreditations and approvals for our core program offerings.

Defendants include this statement in a publication pertaining to its master's degree programs, knowing that students will understand it to mean that the various degrees described in the book are the "core program offerings" that have the requisite specialized accreditation.

100.    With the approval of all Defendants, GCE employs hundreds of recruiters, who are based around the country, including throughout California, as set forth in more detail in Paragraph 140. Defendants have instructed the recruiters to hold themselves out using titles such as "enrollment counselors," "counselors," or "advisors" (referred to herein as "Counselors and Advisors").  By instructing recruiting and marketing professionals to use the titles of Counselor or Advisor, Defendants lead prospective students to believe that these individuals are qualified to provide academic advice that is in the prospective student's best interest, and come to trust the individual as a trusted intermediary who is helping them navigate the difficult choices involved in selecting an appropriate higher education program. But the Counselors and Advisors are not neutral, nor trained in academic counseling, but rather are financially motivated marketing professionals whose continued employment is contingent on meeting enrollment quotas.

101.    Under Defendants' direction, the Counselors and Advisors must adhere to common policies and practices and undergo uniform training, which is designed to ensure that Counselors and Advisors can trick and entrap as many students as possible into enrolling into the University and applying and securing federal student loan funding that will be transferred to Defendants in the form of profits. Defendants' recruiting program that is carried out by the Counselors and Advisors was designed and implemented by Defendants, with input and oversight from each Individual Defendant.

102.    Defendants' scheme to use incentivized Counselors and Advisors to sell students useless coursework violates a federal regulation designed to prevent universities from misleading students. Federal law requires that those schools participating in the federal student loan program agree

to the "Incentive Compensation Ban," which prohibits an institution from providing "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities." 20 U.SC. 1094(a)(20). *See also* 34 C.F.R. 668.14(b)(22). In other words, to ensure that schools are not creating incentives to recruiters to mislead students, the federal government prohibits rewarding recruiters or employees on a per-enrollment basis or otherwise adopting a quota system. While the Incentive Compensation Ban applies to both for-profit and non-profit schools, for-profits are particularly susceptible to violating it, given their profit-seeking mission.

103.   The Individual Defendants have been sued multiple times for violating the Incentive Compensation Ban. When the University of Phoenix was under the leadership of Individual Defendants, it settled two lawsuits alleging violations of this rule. First, in 2004, the school paid $78.5 million to the Department of Education. Afterward, at the direction of the Individual Defendants, the University of Phoenix apparently continued its conduct and later paid $67.5 million to the Department of Justice after a False Claims Act lawsuit was filed alleging violations of this law.

104.   When the Individual Defendants took control of the University, they continued to violate this law that prohibits incentives for securing enrollment. In 2010, GCE settled a lawsuit for $5.2 million over this practice. In 2011, in part because so many for-profit schools were being sued for violations of this regulation, the regulation became more strict. Nevertheless, in 2018, Defendants were sued again by a former recruiter who brought an action under the False Claims Act for Defendants' violation of this law; that suit is still ongoing.

105.   The Individual Defendants, through GCE and now on behalf of Grand Canyon, continue the conduct of incentivizing enrollment in violation of the law. To drive enrollment, Defendants set monthly enrollment benchmarks for their Counselors and Advisors, financially rewarding those who met the benchmarks via compensation distributed through interstate wire transfers from GCE in Arizona to the Counselors and Advisors, who are based around the country, including in California, in furtherance of their fraudulent scheme. Defendants then place Counselors

and Advisors who fall short on corrective action plans and eventual termination, in violation of the Incentive Compensation Ban.

106.    Defendants employ Enrollment Counselor Managers ("ECMs"), who are responsible for ensuring Counselors and Advisors stay on target and meet enrollment metrics. The ECMs engage directly with Defendant Mueller. The ECMs prepare reports on counselor recruitment performance that Defendant Mueller reviews to ensure they are recruiting enough students to increase his profits, as well as the profits of the other Defendants. Defendant Mueller and the ECMs also meet to discuss enrollment goals and efforts. During these meetings, Defendant Mueller engages in a complete review of enrollment numbers and Counselor compensation. Based on his review, Defendant Mueller instructs ECMs to fire anyone that cannot meet their enrollment targets.

107.    Under the most current compensation plan, designed by the Individual Defendants, including each of the Individual Defendants, Counselors and Advisors must enroll a certain number of students per month and per year, generally between 33 and 70 students annually, depending on the counselor's seniority. Under Defendant Mueller's direction, the ECMs oversee the recruiting and enrollment efforts by the Counselors and Advisors, setting high weekly and monthly goals for their teams, because the ECMs in turn are compensated based on their teams' collective performance. Those EMCs and Counselors and Advisors who cannot meet their monthly or annual enrollment targets are fired; those who do are given higher pay and a higher enrollment quota to meet.

108.    As a result of the enrollment quota system, Counselors and Advisors are pressured by the EMCs, who in turn are pressured by Defendant Mueller, to enroll as many students as possible, even if they believe the student is not qualified or not a good match for the program.

109.    Once enrolled, students are assigned a new student services-oriented Counselor. That Counselor works under a similar compensation scheme as the recruitment-oriented Counselor, and they are compensated and promoted based on whether they are able to maintain certain enrollment levels. In other words, if a student learns that the University is not suitable for their needs or dissatisfied, the student services-oriented Counselor or Advisor is responsible for keeping them

enrolled as long as possible and will be penalized in the form of reduced promotion opportunities and possible termination if too many of their assigned students withdraw. Thus, these Counselors and Advisors are financially motivated to maintain the false impressions as to the University's suitability for a student's career plans left by the recruitment-oriented Counselors and Advisors.

110. In addition to incentivizing enrolling and maintaining attendance among students not suited for the University, Defendants do *not* reward or otherwise provide incentives to ensure that Counselors and Advisors can direct prospective or current students to *other* schools if they discover the University is not a good fit for that person. By contrast, true non-profit universities that are motivated by a charitable mission will act in the best interest of the student and if the programs offered by the university are not suited for that person's career needs, either because it is not appropriate for licensure in the student's desired profession or because the program is too academically rigorous for the student's abilities, they will advise the student to find other opportunities, often assisting in helping them transfer. Because Defendants' goal is to defraud students to increase profits, Defendants actively discourage their Counselors and Advisors from engaging in this sort of conduct, including by tying compensation strictly to enrollment numbers. In other words, Defendants see any student that withdraws or does not enroll as lost profits, and utilizes a compensation policy that ensures that their Counselors and Advisors do as well.

111. Defendants know that as a result of their incentive compensation plans for their Counselors and Advisors, they are motivated to engage in deceptive conduct on Defendants' behalf simply to keep their jobs and make a living, which is precisely the conduct that the Incentive Compensation Ban is designed to prevent.

112. Because Defendants do not offer graduate programs suitable for employment in Regulated Professions, they know that Counselors and Advisors could not actually meet the quotas set for them if they were truthful and not incentivized to lie. In particular, Defendants know that the Counselors and Advisors would struggle to enroll students desiring to work in Regulated Professions in nearly all states other than Arizona, such as California. In addition to providing financial incentives to

their Counselors and Advisors, Defendants train the Counselors and Advisors how to mislead prospective students, including those in California, to encourage them to enroll and to keep them enrolled. Because Defendants have agreed that GCE should fire any Counselor that does not meet their targets and promote those that do, Counselors and Advisors understand that their job and financial security depends on adhering to Defendants' instructions to direct prospective students, including those in California, to enroll at the University using deceptive sales tactics.

113.    First, Defendants have agreed that GCE should train the Counselors and Advisors only on generalities, instead of making them specialists in certain fields. In other words, GCE does not train Counselors and Advisors to specialize in any sort of academic area (e.g. health care, engineering, computer science). Rather, Counselors and Advisors are assigned to prospective students on a random basis, or at best, a geographical one. On the other hand, a typical non-profit university often connects prospective students to academic counselors and advisors with some specialized knowledge in the field in which the student has expressed an interest to ensure that the school will be a good match for the student.  But because of the use of the title "Counselor" or "Advisor," prospective students do not interact with them as they might be marketing professionals or even recruiters, but instead often trust that they are subject matter experts and feel as though they can rely on their advice.

114.    The problem in relying on generalists is particularly problematic, as Defendants maintain an unusually large course catalog and offer dozens of different programs. Defendants have decided that GCE should not train the Counselors and Advisors to learn the nuances of these programs, nor do they require Counselors and Advisors to refer students to a different Counselor if they cannot truthfully or accurately answer prospective students' questions. In particular, Defendants determined that Counselors should not be knowledgeable about the licensing requirements in states in such as California, because they do not want the Counselors and Advisors to be empowered to advise students in these states that the programs are not suitable for professional licensure, thereby encouraging more of them to enroll. Indeed, even if other Counselors and Advisors were more qualified to answer certain students' questions, because Counselors and Advisors need to enroll a

certain number of people every month, they have no incentive to refer a potentially interested student to that Counselor to close the deal. Rather, Defendants intended for it to be in their financial self-interest to mislead the prospective student.

115.    Second, with the agreement and approval of all Defendants, GCE instructs all Counselors and Advisors to avoid communicating with prospective students in writing and to use the telephone at all times. GCE in particular instructs them to avoid written communication to avoid leaving a written record of their deceptive tactics. Counselors and Advisors thus only engage in administrative matters, such as scheduling a time to talk, over email. The Counselors and Advisors make their affirmative misrepresentations and omissions to Class members via oral sales pitches and discussions to answer students' questions over the phone and interstate wires, consistent with the instructions provided by Defendants.

116.    Third, Defendants monitor and train all Counselors and Advisors on best practices. Indeed, Defendants are aware of the misrepresentations made on their behalf by Counselors and Advisors because they have agreed that GCE should use the interstate wires to record Counselor calls with students and prospective students, including those in California. These calls are studied by EMCs and other supervisors, and the most successful methods for misrepresenting unaccredited programs are then shared with all Counselors and Advisors. Because of Defendants' practice of recording calls, Defendants are well aware of the active misrepresentation that is occurring and indeed encourage such efforts. By relying on audio recordings instead of reviewing written materials, Defendants alone can monitor the misrepresentations, ensuring that those fraudulent induced to enroll do not have a paper trail of the misrepresentations and false advertising on which they relied, and which Defendants directed.

117.    Fourth, with the agreement and approval of all Defendants, GCE trains Counselors and Advisors on how to answer common questions or deal with objections or hesitation on the part of the prospective student using oral representations and omissions that always encourages the prospective student to enroll. For example, if a prospective student expressed interest in a program not offered by

Defendants, Defendants instruct and train Counselors and Advisors on how to direct that prospective student towards other programs and sell the program as one that will meet the student's needs, even if it does not and cannot, rather than encourage the student to look for a different school. To respond to questions that the Counselor or Advisors cannot answer truthfully without losing the prospective enrollment, Defendants instruct and train Counselors and Advisors to talk in broad terms, and use psychological motivation, like finding the student's weaknesses and regrets, and use those to encourage the student to dream big and start living the future now.

118.    Fifth, with the agreement and approval of all Defendants, GCE trains Counselors and Advisors on how to answer questions regarding accreditation, and in particular, accreditation for Regulated Professions in a way that will encourage the student to enroll, even when the school will not meet their needs. The Counselors and Advisors engage in these misrepresentations and omissions orally on the phone with prospective students using interstate wires under the direction and oversight of the Defendants. In particular, on Defendants' behalf, GCE instructs Counselors and Advisors that in their phone calls with prospective students, they must consistently strive to omit the fact that a program is not accredited for purposes of practicing their desired Regulated Profession in their state. Rather, Defendants have agreed that GCE should instruct Counselors and Advisors to only provide this information if directly asked and as a last resort, advising them to first try to exhaust a variety of tactics, such as trying to change the subject or focus the student on the wrong thing, by telling the student that the degree is suitable for something else, or informing them of their regional HLC accreditation. Defendants know that these oral misrepresentations and omissions made to induce students to enroll does in fact mislead students into enrolling. On behalf of Defendants, GCE instructed their Counselors and Advisors to withhold information about accreditation for the Regulated Professions, encouraging them to just get the student enrolled without regard to whether it was an appropriate fit. Defendants also know that students in California and other populous states would never enroll at the University if they were told that their graduate programs are not suitable for work in Regulated Professions. Because of that, they have instructed the Counselors and Advisors to

engage in this pattern of misrepresentations and omissions to prospective students in California and other populous states to help drive enrollment from those states.

119.    When prospective students ask "is this program accredited?" Counselors and Advisors are taught to respond "absolutely, Grand Canyon is fully accredited," thus putting potential students at ease. Defendants and their Counselors and Advisors know that when prospective graduate students ask this question, they are referring to the specific required accreditation needed for Regulated Professions, and not general regional accreditation, but GCE trains Counselors and Advisors to treat the question as one that refers only to general regional accreditation. If a student's question is more specific or clearly in reference to accreditation for a Regulated Profession, Defendants train the Counselors and Advisors to make statements that seem truthful on their face and in isolation, but highly misleading in response to the question posed. For example, the Counselors and Advisors are trained to tell students asking about the specifics of what their degree can do to answer in more broad answers, such as telling prospective students inquiring about whether a degree is appropriate for work in a Regulated Profession in their state that they "can work anywhere with a degree from Grand Canyon." That statement might be true in that it implies a student may be able to work in a non-regulated profession that simply required some higher education, but misleading in that it leads a student who has asked if they can work as a therapist in California to believe that they can. Other canned responses that Defendants provide Counselors and Advisors to use in response to such questions are to direct a student to a different program, tell them that their regional accreditation is "umbrella accreditation" to suggest that it encompasses a lot of smaller, more specific types of accreditation, or to tell them about how the degree will also prepare them to do things like teach in that field or obtain a Ph.D., which communicates to students that it is well-regarded, putting to rest concerns about regional accreditation.

120.    Sixth, with the agreement and approval of all Defendants, GCE instructs Counselors and Advisors on how to close a deal with a prospective student to ensure they enroll quickly before they can change their mind or discover truthful information about the school. When prospective students submit an inquiry about the school, GCE assigns them a Counselor, who begins engaging with

the person within a day or two by calling them to answer questions. Counselors and Advisors are trained to be positive and encouraging, but to pressure the student into enrolling quickly. If a Counselor notices someone is interested, the Counselor will engage in follow up calls at least two or three times a week, and is taught to observe when the prospective student is free to time their calls accordingly. GCE trains the Counselors and Advisors to be persistent and continue to call until enrollment has been secured. Because Defendants, through GCE have provided these instructions to Counselors and Advisors, they direct multiple calls using interstate wires to each student who enrolls, resulting in hundreds of thousands of calls having been directed to prospective California students during the last four years.

121.    With the agreement and approval of all Defendants, GCE has trained its Counselors and Advisors to take advantage of the non-traditional nature of the school to get students enrolled and starting class before they have a chance to question their decisions. For many programs, including those for the Regulated Professions, the University does not operate on a traditional semester or quarter system, but Defendants have designed the curriculum to rely heavily on pre-recorded classes that are ready to go, so students can elect to begin their online classes any day of the year. Defendants also accept nearly every applicant and do so without a burdensome application process, usually approving admission the same day, or within a few days, of a request to enroll. Thus, whereas for typical academic programs, students usually have a few weeks or months to accept an offer of admission, and then more time until a semester begin and thus have time to make a decision and think it over, Defendants take away the time for second guessing. Prospective students can be enrolled and taking classes within a few weeks of enrolling, with the primary reason for delay being the completion of the financial aid paperwork. Defendants use these practices to enroll more students, including those from California. Indeed, by moving fast and relying on Counselors and Advisors who frequently call students, Defendant can get students enrolled and taking classes before they have a chance to consider other options.

122.     Seventh, Defendants also know that for-profit schools have received a bad reputation, and thus, instruct their recruiters to avoid volunteering the fact that the school is for-profit to prospective students. Instead, with the agreement and approval of all Defendants, GCE and Grand Canyon heavily rely on the fact that the University has a Christian affiliation and use representations about that affiliation in their marketing and recruitment. Counselors and Advisors are advised and instructed to tell prospective students of that fact, including those in California. The representation is material to all prospective students, not just those looking for a Christian-affiliated university, as it carries with it the suggestion that the school's mission is a charitable one, not a profit-oriented one. Few, if any students enroll at the University knowing that it is operated and controlled by for-profit entities.

123.     Eighth, to train Counselors and Advisors in the aforementioned practices, with the agreement and approval of all Defendants, GCE instructs the EMCs to engage in role playing exercises with them to train them on how to sell the school, respond to the aforementioned situations, and address other concerns about cost or time required to attend classes and complete coursework. These exercises are done to ensure that more students can be enrolled, including students from California.

124.     As a result of these policies and procedures, Plaintiff and those similarly situated were subject to deceptive marketing calls that assured them that a given program was suitable for their needs, while omitting material information regarding the limitations or inappropriate nature of the degree for their career goals.

125.     Under the direction and approval of all Defendants, the Counselors and Advisors have placed tens of thousands of calls to Class members during the Class period in accordance with the aforementioned procedures. Each call was intended to further the goals of the enterprise through a pattern of deceptive and misleading representations and omissions designed to trick Class members in obtaining federal student loans and enrolling at the University, without regard to whether it offered programs suitable for employment and licensure in Regulated Professions. These hundreds of thousands of telephone calls over the last four years nearly always used interstate wires, from the

Counselors and Advisors based around the country, including California, to prospective students around the country, including California, and in some instances, recorded by GCE in Arizona. The specific dates and times of each call, as well as the locations from where the Counselors and Advisors made the calls, are in the control of Defendants.

      4.      **Defendants pressure students to utilize federal student loans to drive their profits.**

126.    Defendants know that students typically cannot pay for a University education out of pocket and must rely on federal student loans to do so.

127.    According to an annual report, 71% of University funding comes from the federal government's student loan programs.

128.    To ensure that a student does not enroll in the University simply because of a lack of access to funds or that a prospective student delays enrollment because the process of obtaining loans is too complicated or difficult to understand, or because they are otherwise hesitant to borrow funds, Defendants have agreed that GCE should develop and maintain a comprehensive and seamless program for securing these loans for students, including those in California.

129.    First, because of the importance of an uninterrupted cash flow from the student loan program Defendants have decided to devote substantial GCE staff time to supporting students in obtaining federal student loans. Presently, while Grand Canyon is the federally-approved institution to receive student loan monies, all of the contact with students is handled by GCE employees. As GCE noted in its 2018 annual report, it employed approximately 2,800 professional and administrative personnel. With the approval of all Defendants, GCE also employs Counselors and Advisors and other personnel to pressure prospective students, including those in California, into applying for federal student aid quickly to pay for their degree programs, using interstate wires to place calls between the Counselors and Advisors' locations and the prospective students' locations.

130.    To further facilitate the process and pressure students into enrolling, Defendants have agreed to allow GCE to highly automate this process, such that students have no forms to fill out and

sign and return to GCE.  Rather, GCE software prepares the forms, which are electronically submitted over interstate wires from Arizona, on behalf of students around the country, including those in California, to the federal government, including the DOE headquarters in Washington, DC, so that funds procured from the student loan program can be paid directly to Grand Canyon and/or GCE using interstate wires. This program is designed in large part to increase enrollment of students who are not based in close geographic proximity to the school, such as those in California, so that students can more quickly be enrolled without needing to gather physical paperwork, and arrange for printing and mailing.

131.    Defendants have designed the program so that many students are not even aware that the school is procuring loans on their behalf. Before they know it, they are tens of thousands of dollars in debt without ever being informed of the total amount of debt that they are accruing. GCE, under the direction and approval of the other Defendants, have agreed to train Counselors and Advisors and other staff to gloss over the details of loans that they procure for students. For example, they rarely provide the total amount of debt accrued or offer any information on the anticipated amount or duration of loan payments. Since loan repayments do not begin until students either graduate or quit the program, most students are not aware of the enormity of the debt burden they are assuming as an online student.

132.    Under the direction and approval of all Defendants, GCE has secured tens of thousands of student loans in Class members' names during the Class period in accordance with the aforementioned procedures. Each loan was intended to further the goals of the enterprise by securing funds needed to ensure the enterprise profits and continues, while pressuring Class members to enroll at the University, without regard to whether Defendants could offer them programs suitable for employment and licensure in Regulated Professions. These tens of thousands of loans obtained, including thousands from California, were done so using interstate wires, by which paperwork and monies were exchanged between Defendants in Arizona, the DOE in Washington, DC, and the Class

members around the country. Information pertaining to the dates, times, and amounts of the wire transfers are in the control of Defendants and the DOE.

### 5. Defendants market their online programs in California and nationwide to prospective students interested in working in Regulated Professions.

133.   While there is a physical campus associated with the University, Defendants heavily market their online education program. Because students enrolling in online education do not require physical classrooms or require Defendants to maintain libraries, laboratories, or other physical structures, Defendants can earn more money from online students than they can from students who enroll on campus. Moreover, because students can live anywhere and enroll in the online program, Defendants know their online program has the potential to attract potential students regardless of their preferred geographic preference.

134.   Defendants further know and have designed their online program to be particularly attractive to fields of students seeking education to prepare them for Regulated Professions. Defendants know that many prospective students desiring to work in Regulated Professions are often non-traditional students. Many are working in entry level jobs in health care or education, but are seeking to be promoted or hold an official title, which they cannot do without completing the educational requirements mandated by the relevant regulatory bodies in their states and fields. Defendants know that online education programs are particularly attractive to non-traditional students, and in particular, those interested in working in a Regulated Profession, because they do not require the student to relocate, and the online nature usually allows for more flexibility in scheduling classes and assignments around a work schedule.

135.   Defendants however know that most of their programs purporting to prepare students for work in Regulated Professions are not in fact accredited for that purpose in many states in which Defendants advertise and enroll students. Nevertheless, Defendants engage in nationwide advertising for these programs, omitting information as to the particulars of each program's accreditation. The information is omitted in print advertisements, and Defendants instruct Counselors and Advisors to

not only omit it in their oral communications with students, but to answer questions deceptively to lead the student to believe that it is accredited for their desired purpose, as described in Paragraphs 117-10. Defendants intentionally do not provide information as to their specific accreditation by state for each of their educational programs because they know that none of the students interested in enrolling in education programs to prepare them for Regulated Professions would enroll if they knew that the program was not accredited for purposes of preparing them for work in that field in their state.

136.    As a result, Defendants advertise their online programs nationwide. Defendants purchase online advertising, such as sponsored search results and Facebook advertisements, to direct to potential students around the country. They also publish advertisements in national media outlets, run on major networks, and use social media to reach people around the country. For example, in the summer of 2020, Defendants were running commercials for the University on the Fox Network in Fresno, California. None of these advertisements make disclosures regarding the suitability of the programs for practice in Regulated Professions in various geographic areas.

137.    Defendants also employ Counselors and Advisors, as described in Paragraph 100, as well as other marketing professionals that reside around the country and work to recruit students nationwide. These Counselors and Advisors and recruiters attend high schools to recruit undergraduates and events designed to provide information to people seeking to obtain masters' and other professional degrees. In some instances, Defendants will even fly California prospective students out to their campus in Phoenix to convince them to enroll.

138.    Like most for-profit universities, Defendants direct their advertising to first generation Americans, immigrants, people of color, and veterans.

139.    Because California is the most populous state in the country and thus, has a high number of potential students, and in particular, the highest number of immigrants and first generation Americans in the country, it is a primary recipient of Defendants' advertising, and accordingly, Defendants have each agreed to take steps to ensure that prospective students in California are targets of the deceptive, high pressure marketing techniques.

140.     According to LinkedIn, under the direction of the Individual Defendants and on behalf of Grand Canyon, GCE employ dozens of Counselors and Advisors, as well as at least one "Marketing Host," in California. GCE maintains a "Call Center Specialist" based in California. Many more California-based employees on LinkedIn hold themselves out as having positions with "Grand Canyon University," but because "Grand Canyon University" used to be the trade name of GCE and Grand Canyon continues to contract marketing and recruitment functions to GCE, these individuals could be employed with either GCE or Grand Canyon. These individuals include even more Counselors and Advisors based all over California, including in Sacramento and Fresno. It is likely that the numbers of Counselors and Advisors and employees and independent contractors based in California is considerably larger than the dozens that are identifiable from LinkedIn.

141.     Under the direction and oversight of Defendants, and in particular Defendant Mueller and GCE, on behalf of all Defendants, these employees direct the misleading marketing calls, such as those carried out in accordance with the practices described in Paragraphs 113-25, to Class members in California and around the country. Under the direction of the Individual Defendants and on behalf of Grand Canyon, GCE also employs Counselors and Advisors in Arizona and other states that also direct misleading marketing calls to prospective students in California using interstate wires.

142.     Under the direction and oversight of Defendants, and in particular, Defendant Mueller and GCE, the California-based Counselors and Advisors, like all of Defendants' recruiters, including those based in Arizona, engage in telemarketing on behalf of the Defendants, and are required to call upwards of 80 people a day to further Defendants' marketing efforts. Many of these calls are placed using interstate wires.

143.     All Defendants agreed and approved the dissemination of marketing in California by their Counselors and Advisors. The Counselors and Advisors work for Grand Canyon, either directly, or indirectly through their work at GCE, both of which approve and oversee their work. Because Defendant Mueller closely oversees recruiting efforts, *see* ¶¶ 106-08, he approved the dissemination of University marketing and recruiting in California. Defendant Bachus, as Chief Financial Officer,

ensures that the Counselors and Advisors, including those in California, are compensated for their work on behalf of the Defendants, and he approves and oversees their compensation, which is paid by GCE in Arizona to Counselors and Advisors in California using interstate wires. Defendant Meyer, as Chief Operating Officer, oversees their presence in California using interstate wires.

144.    As California represents approximately 12% of the country's population, an estimated 10,800 Californians are presently enrolled in Grand Canyon online degree programs. More Californians are enrolled in online degree programs with the University than are enrolled at the University of California – Merced.  Based on Defendants' 2017 tuition revenues of $974,134,000, Californians collectively pay more than 100 million dollars to Defendants every single year.

145.    Information required to determine the full extent to which each Defendant directed advertising and communications using interstate wires and mail towards California and approved and oversaw California-based recruitment efforts, including the number of individuals engaged in the dissemination of false and deceptive advertising described herein and working under direction of GCE and the Individual Defendants, is in the exclusive control of Defendants and can be proven through discovery.

### 6.    Defendants' omissions and misrepresentations regarding accreditation violate federal law.

146.    Federal regulations prohibit various material misrepresentations and deceptive statements that mislead students enrolling in educational programs. Defendants' deceptive marketing tactics violate these regulations.

147.    For example, 34 C.F.R. 668.72(a), prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs [. . . including. . .] false, erroneous or misleading statements concerning . . . [t]he type(s), specific source(s), nature and extent of its institutional, programmatic, or specialized accreditation."

148.    34 C.F.R. 668.72(c) prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs [. . . including. . .] false, erroneous or misleading statements

concerning . . . [w]hether successful completion of a course of instruction qualifies a student . . . to receive, to apply to take or to take the examination required to receive, a local, State, or Federal license, or a nongovernmental certification required as a precondition for employment, or to perform certain functions in the States in which the educational program is offered, or to meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment in a recognized occupation for which the program is represented to prepare students."

149.    34 C.F.R. 668.72(g) prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs [. . . including. . .] false, erroneous or misleading statements concerning . . . [t]he availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet."

150.    34 C.F.R. 668.72(n) prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs [. . . including. . .] false, erroneous or misleading statements concerning . . . [w]hether the academic, professional, or occupational degree that the institution will confer upon completion of the course of study has been authorized by the appropriate State educational agency.

151.    Nevertheless, Defendants train and incentivize their Counselors and Advisors to engage in these misrepresentations and omissions, as set forth in Paragraphs 102-25.

152.    In addition, on July 1, 2020, the DOE put into effect new regulations designed to curb abuses by schools that do not adequately disclose specialized licensing and accreditation. These rules require that institutions determine whether their curriculum meets the educational requirements for licensing in each state, and if it has not made such a determination, it must tell its students. It further requires that institutions tell prospective and enrolled students in writing whether a degree program meets the educational requirements of the state where they are located. Moreover, the new rules state that schools may not tell students to look up their states' requirements.

153.    These new regulations reflect the fact that the DOE has deemed these types of disclosures and omissions material to students.

154.    While Defendants' intentional omissions and deceptions regarding this issue were unlawful, unfair, and fraudulent before this rule went into effect, Defendants have not yet begun to comply. For example, as of July 27, 2020, Defendants typically only list the accreditation a program does have, but they do not affirmatively disclose to students what accreditation the program does not have.

### 7.    Defendants have profited and intend to continue to profit from their ongoing scheme to defraud students.

155.    Defendants have profited enormously from their scheme. GCE's 2018 Annual Report shows the net income (i.e. profits after paying expenses, such as academic costs) over the years:

| | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| *Net income [**in millions**]* | *$259,175* | *$229,011* | *$203,319* | *$148,514* | *$131,411* |

156.    In order to keep profits climbing, however, Defendants need to sign up more and more students. In 2018, enrollment climbed from 90,297 to 97,369. This followed an even larger increase in student enrollment as described in 2017 Annual Report:

> Our enrollment at December 31, 2017 was approximately 90,300, representing an increase of approximately 10.2% over our enrollment at December 31, 2016.  Our net revenue and operating income for the year ended December 31, 2017 were $974.1 million and $282.8 million, respectively, representing increases of 11.5% and 19.2%, respectively, over the year ended December 31, 2016.  Our net revenue and operating income for the year ended December 31, 2016 were $873.3 million and $237.2 million, respectively, representing increases of 12.2% and 12.8%, respectively, over the year ended December 31, 2015.

This means Defendants are growing the University each year by the size of a mid-sized university.

157.    The vast majority of University students are online students who never set foot on the school's Arizona campus. According to GCE's  2017 financial reporting, for instance, as of December 31, 2018, 90,297 were enrolled in the University, nearly 80% of which were in the online programs, and were drawn in from all over the country.

158.    Each online student who enrolls results in an average of over $3,000 in annual profit.

159.     In 2016, Defendant Mueller earned $2.6 million and the other three top executives earned over $1 million each, after stock awards and incentive compensation.[6] According to their 2020 corporate disclosure statement filed with the state of California, Defendant Mueller earned over $1.9 million in compensation, and held 13,086 shares of stock. Defendant Bachus earned over $1.3 million and holds 6,983 shares. This compensation is many times a typical salary of the head of large non-profit university.

160.     Before and during the Class period, Defendants have directed GCE to make sworn filings with the Securities and Exchange Commission, statements typically signed by Defendant Bachus, that reveal that all proceeds of the racketeering scheme and conspiracy have been plowed back into the effort to grow the size and profitability of the enterprise, including the following:

(a)  GCE has paid no dividends to shareholders during the relevant time period, thus all profits are being retained to grow the enterprise;

(b)  GCE's spending on advertising and marketing has increased each year (now exceeding $142,900,000 per year), thus reflecting an intent to continue to mislead and further the goals of the enterprise by exposing more unsuspecting students to harm;

(c)  GCE now spends more than $60,000,000 each year on Internet advertising and marketing, generating over 70,000 potential student leads each month, and thereby using illicit prior proceeds to expand the enterprise;

(d)  GCE has actually increased the number of online students enrolled at the University every year, thus proving the success of its effort to grow the enterprise with the fraudulent proceeds of the conspiracy;

(e)  Profits are increasing every year, thus reinforcing the scheme of using all profits to grow the enterprise;

---

[6]  https://www.phoenixnewtimes.com/news/divergent-views-of-for-profit-grand-canyon-university-9705013

(f)  GCE has recently used tens of millions of dollars of the proceeds of the enterprise (and additional bank loans) to purchase Orbis Education Services, thereby expanding its reach into new graduate degree programs and exposing even more potential students to harm; and

(g)  GCE and GCU have paid their senior executives tens of millions of dollars, thus securing the loyalty of those persons directing and growing the enterprise.

161.   During a time when for-profit universities are crumbling, Defendants' financial success is an outlier. DeVry University and University of Phoenix are suffering from declining enrollment and the latter is no longer publicly traded. Corinthian Colleges and ITT Technical Institutes are defunct. Given the bad reputation that for-profit universities have endured and the increased regulatory burden, those large for-profit universities that have not successfully converted to non-profit status have either experienced a major downsizing of operations or closed completely, with the University being the sole exception. While Defendants claim to investors and the public that their rapid growth and enormous profitability is a reflection of the quality of the program, Defendants' success is not because of the quality of their programs and truth in marketing, but because they have perfected their fraud.

162.   Meanwhile, students from around the country have been harmed by Defendants' scheme. Hundreds of complaints lodged by students and former students with the Better Business Bureau and various online forums provide further evidence of Defendants' deception. For example, this complaint was lodged with the Better Business Bureau on March 14, 2019:

> They told me that they were accredited in South Carolina and they are not.  I started class on Sunday and have been trying to get out of the school for three days.  Initially they apologized for lying to me and said that they were going to get me a refund and then someone else called me and insisted that they are accredited but I have to file for a change.  That is NOT being accredited in my state.  I was lied to and now they are trying to collect 935$ from me for dropping out of the class when I had no idea that they were not accredited in my state and they lied to me.  They told me they were.  The only reason I found out was because I saw on their website looking for information for an assignment that they are only accredited in 19 states and South Carolina is not one.  It took me three phone calls and three emails to FINALLY get out of the school and I totally feel cheated!  How can you do this to an out of state student with a low income and then expect them to pay for your services when you lied to them from the very beginning?  That is not my fault, that is their fault for being dishonest!

163.    By way of further example, this complaint appeared on www.gradreports.com and was posted on May 3, 2018:

> So I just graduated April 2018, and I received the masters in Education leading to a credential in multiple subjects and frankly, I am highly disappointed that the school lacks communication regarding specific requirements from outside states.  I live in CA and I was never told that I needed a CLAD authorization which is an authorization to teach language learners. (their SEI requirement) which caused me to add additional testing after the program ended.  Do not waste your time going here if you live in CA.  CA's schools has [sic] this authorization embedded in their teacher programs so I would go that route.  If you go here, you will end up taking additional courses which will cause you to add to your debt.  Now, I have to pay 3000 for a course in CLAD certification and add 9-12 months which I could be searching for employment.  So disappointed and sad.

164.    The same scheme has clearly been in effect for years.  This complaint was listed on www.onlinedegreereviews.org on May 4, 2016:

> I am at the end of the first class that Grand Canyon University said I must take and pay for.  But, the degree I wanted was social work and I was told I could take the social work class, but I had to find somewhere to get the hours I needed as volunteer services which was 400 hours.  I called the board for social services in my area and found out that GCU is not accredited for social work.  So when I contacted my student adviser.  She told me that the degree does not lead to a license.  Of course I asked her what was the degree valid for if I can not get a license.  This was something I truly wanted to do.  To help many in the community who are less fortunate.  Now, they are telling me that I will have to pay for three classes even though I have not taken nothing but one class.  So, now I am stuck at their school that lied to me about having a relevant social worker program.  I am so disappointed and I believe that this type of fraud to students who are receiving student loans that are guaranteed by the US government should be looked into.  They should not be able to commit fraud at their leisure.

165.    This complaint was listed on www.onlinedegreereviews.org on June 16, 2014:

> I live in Illinois and was assured by the recruiter that the University's program would be accepted.  I contacted the state, they never responded to me.  I completed the courses and earned me masters...then months later, Illinois tells me they do not recognize them.  Have a masters I can't use now.

**D.      PLAINTIFF'S FACTUAL ALLEGATIONS**

166.    Plaintiff stands in the shoes of thousands of other victims of Defendants' improper practices. She would never have enrolled at the University if she had known the program she was entering was not accredited by California such that she could work in her desired Regulated Profession.

1    Defendants knew Plaintiff was being enrolled in programs that were worthless to her, but they
2    proceeded to sign her up purely based on greed.

3        167.    Ms. Ogdon lives in Fresno, California. Ms. Ogdon's goal has always been to be a mental
4    health therapist. After she completed her bachelor's degree in 2015, she was accepted into a program at
5    a school in southern California, where she was living at the time. But for personal reasons, she needed
6    to return to Fresno, where she was from and where her family lived, and was unable to begin her
7    graduate studies.

8        168.    Ms. Ogdon returned to Fresno in 2015 and began working full time at a high school.
9    She continued to want to continue her education, however. To pursue her goal of becoming a mental
10   health therapist, in or around the summer of 2017, Ms. Ogdon began to research masters' degree
11   programs. Ms. Ogdon planned to be a mental health therapist where she lives in California, and
12   planned to obtain a master's degree from an accredited school that would allow her to work in
13   California when she completed the degree. Ms. Ogdon was particularly interested in online programs;
14   she was working two jobs and wanted a flexible program that would work with her busy schedule. She
15   also knew that online programs often offered more flexible start dates, and would not require her to
16   wait a year to enroll.

17       169.    Ms. Ogdon researched online programs. From her home in Fresno, Ms. Ogdon did a
18   Google search for online degree programs that could be used to reach her goal of being a mental health
19   therapist in California. When Ms. Ogdon did her search, Grand Canyon University came up both in the
20   sponsored search results, and the general search results.

21       170.    The Grand Canyon search results came up for Ms. Ogdon when she was doing her
22   search in Fresno, California, because Defendants had agreed that GCE should use interstate wires to
23   purchase and direct advertising about its online masters' degree programs to prospective students
24   searching for such programs in California.

25       171.    Due to additional marketing that Defendants directed towards potential students in
26   California like Plaintiff, Ms. Ogdon had heard of Grand Canyon University. She recalled seeing

27

28

commercials for their undergraduate program, which Defendants would air on television in California during basketball season. And she worked at a high school in Fresno, and during her employment at the school, she had seen posters advertising it to graduating seniors at the school. Those posters were in the school because Defendants had agreed that GCE should use interstate mail to send them from Arizona to Counselors and Advisors based in or around Fresno to display in local high schools to advertise the University. These ads led her to believe it was a legitimate educational institution.

172.    During this time, Ms. Ogdon was unaware of the fact that the University was a for-profit school. She knew that it was a Christian university from the school's advertising, and did not believe that a Christian university would also be a for-profit school. Of course, the search results and posters that Defendants directed at potential targets like Ms. Ogdon in California did not mention that Grand Canyon was a for-profit school.

173.    Following her search for online programs that she could complete to become a mental health therapist in California, in or around the summer of 2017, Ms. Ogdon completed an online form on the University's website. She submitted her online form from her home in Fresno over the interstate wires to GCE. At that time, the University was under the sole control of GCE and the Individual Defendants. Approximately halfway through her studies, Grand Canyon would nominally assume control of the University

174.    A couple days after Ms. Ogdon completed that form, GCE directed a Counselor, Michael Granitz, to contact Ms. Ogdon in California over the telephone to attempt to enroll her. At the time the call was made, Defendants knew that Ms. Ogdon was in California, and they directed Mr. Granitz to make the call because they had agreed to recruit students in California. On the call, Mr. Granitz represented that he was a Counselor with "Grand Canyon University." Mr. Granitz was required to enroll a certain number of students every month to maintain his employment and had been trained by GCE. In accordance with the policies and procedures described in Paragraphs 102-12, Defendant Mueller and Meyer supervised Mr. Granitz while Defendant Bachus paid him.

175.     Over the next several weeks, Ms. Ogdon had a number of conversations with Mr. Granitz about the possibility of enrolling at the University. When Mr. Granitz placed these calls to Ms. Ogdon, he was either based in Indiana or Arizona. Under the direction and oversight of GCE and Defendant Mueller, he called her in California over interstate phone lines approximately 2-3 times a week. At one point, Ms. Ogdon told him she could speak at 10:45 a.m., because that was when she had her lunch break, and from that point on, Mr. Granitz would often call at or shortly after 10:45 a.m. because Defendants had trained him to identify good times to call to make his deceptive sales pitch and pressure her to enroll.

176.     During these calls in or around the summer of 2017, Ms. Ogdon spoke at length with Mr. Granitz. She informed him that her goal was to become a mental health therapist. At all times during their discussions, Mr. Granitz knew that Ms. Ogdon lived in California, where she intended to practice after graduation. Since she lived in California, their conversations naturally centered around obtaining a degree so she could practice in California where she already lived and also wanted to work. On behalf of Defendants, Mr. Granitz assured Ms. Ogdon that the University had an excellent program that would meet her needs.

177.     Because Ms. Ogdon knew that the mental health profession was a Regulated Profession in the state of California, she knew she would have to obtain a degree from a program accredited for that purpose. On a call in the summer of 2017, Ms. Ogdon asked Mr. Granitz if the program was approved by the American Psychological Association and appropriately accredited for licensure in California. Mr. Granitz assured her that the program was accredited both by the American Psychological Association and California licensing authorities. In particular, he told her that the program was covered under the HLC's accreditation, and that that accreditation was like an umbrella that covered everything. He also told her that she would be able to work in her state with the HLC accreditation—a regional accreditation that is not sufficient for Ms. Ogdon's chosen Regulated Profession in the state of California. He further lied that the umbrella HLC accreditation was superior

to other accreditations because with it, she could teach psychology, obtain a PhD, or pursue a variety of opportunities.

178.    Mr. Granitz knew the representations and omissions were not true and was likely to deceive Ms. Ogdon into enrolling. He made it in accordance with the directions and training provided to him by the Defendants, who had trained and directed him with the intent that he make these false representations and omissions to prospective students orally over interstate phone lines, including those such as Ms. Ogdon in California, as described in Paragraph 113-25. On behalf of GCE and Defendants, Mr. Granitz pursued Ms. Ogdon with enthusiastic sales calls filled with false explanations about accreditation that led Ms. Ogdon to believe that a degree from the University would not only allow her to be a mental health therapist in California, but afford more options that she might not have if she selected a program that had been certified only by the American Psychology Association, and not by the larger HLC umbrella.

179.    At no time during Ms. Ogdon's interstate telephone calls with Mr. Granitz did he inform her that the program was not in fact approved and accredited by the American Psychology Association. Motivated by compensation incentives that the Individual Defendants designed to increase their profits, Mr. Granitz did not tell Ms. Ogdon that she would not be qualified for licensure to work as a mental health therapist in the state of California when advertising and selling the University to a California resident on Defendants' behalf.

180.    At all times during these interstate telephone conversations, Mr. Granitz and Defendants knew that the program into which they would enroll Ms. Ogdon was not accredited by the American Psychology Association or suitable for licensure in California. Mr. Granitz and Defendants also knew that meeting the requirements to practice in California where she lived was a material fact to Ms. Ogdon's decision to select and attend the University. Spurred on by incentives from Defendants, Mr. Granitz intentionally omitted that material information. Indeed, because Defendants catered only to their own bottom line, Mr. Granitz omitted the material information that the University would not

qualify Ms. Ogdon to work a mental health therapist where she lived in California at the direction and approval of Defendants—and in particular at the direction of GCE and Defendant Mueller.

181.     On September 6, 2017, Defendants sent Ms. Ogdon a notification of her "acceptance" to Grand Canyon. The acceptance notification was sent to her over interstate wires under the direction of GCE and with the approval of and on behalf of all Defendants.

182.     To ensure that Ms. Ogdon would be ensnared in their fraudulent scheme, Defendants also rushed her to make a decision. Defendants knew that if they gave Ms. Ogdon a long period of time to make a decision about enrolling, that she might discover that the program was not suitable for her needs. In addition, Defendants motivated Mr. Granitz to push Ms. Ogdon to make a decision as soon as possible because Defendants could terminate him for not enrolling enough students. With the possible threat of termination looming over him, Mr. Granitz could not afford the amount of time he spent courting Ms. Ogdon with false statements about accreditation without enrolling her. In other words, the significant amount of time that Mr. Granitz had invested calling Ms. Ogdon—time that could have been spent on other marks—would have been wasted. Thus, Mr. Granitz was motivated to pressure Ms. Ogdon to make a decision and begin her studies as soon as possible. In the summer/fall of 2017, before and after her acceptance, Mr. Granitz continued to place interstate calls to Ms. Ogdon two or three times a week to pressure her to make a decision, complete her financial aid forms, and enroll.

183.     During these conversations, which took place between August and mid-September 2017, Mr. Granitz pressured Ms. Ogdon into making a quick decision. He often told her that she could begin her studies within a few days of enrollment. After receiving the acceptance, she told Mr. Granitz that she needed a week to think it through and discuss it with trusted family. In accordance with the procedures designed by Defendants and described in Paragraph 120, Mr. Granitz however continued to call that week—using interstate wires. On those calls Mr. Granitz also continued to pressure her to complete the financial aid paperwork and to tell her she could begin classes the next week.

184.    Around that time, Ms. Ogdon had begun inquiring into other programs at other schools, and she observed that those schools would provide her with some information and leave it to her to follow up. Mr. Granitz on the other hand, would call frequently and present a very thrilling vision of her future and urge her not to wait to begin it—a strategy that was consistent with the troubling psychologically manipulative sales tactics described in Paragraphs 94, 113-25.  Because of the time that Mr. Granitz had invested in her, she believed that the school really cared about her future and trusted their representations and promises. But, in fact, Mr. Granitz was motivated by the financial incentives designed by Defendants and described in Paragraphs 102-12.

185.    These further misrepresentations and omissions, as well as the high pressure calling patterns, were done in accordance with the directions and training provided by Mr. Granitz by Defendants, who had trained and directed him with the intent that he make these false representations and omissions to prospective students orally over interstate phone lines, including students such as Ms. Ogdon in California, as described in Paragraph 113-25.

186.    In late September 2017, drawn in by Defendants' sales tactics and false assurances about accreditation, Ms. Ogdon agreed to attend the University. In other words, Ms. Ogdon's enrollment was in response to Defendants' high-pressure tactics and in reliance on Defendants' omission regarding the true nature of the master's program's accreditation.

187.    On behalf of Defendants, Mr. Granitz enrolled Ms. Ogdon in the Master of Science in Psychology with an Emphasis in Health Psychology program. On or around September 20, 2017, Ms. Ogdon transmitted formal acceptance of GCE's enrollment offer via the internet over interstate wires from Fresno, California, to GCE in Arizona. Around this time, paperwork for her to obtain federal student loans was prepared and transmitted over interstate wires in accordance with the procedures described in Paragraphs 126-32.

188.    Shortly before she began her studies at the University, in October 2017, Ms. Ogdon also spoke with another advisor—Student Services Counselor Sabrina Landa—concerning Grand Canyon's accreditation in the state of California to ensure that this program was what she needed to

become a mental health therapist. At the time of these interstate telephone calls, Ms. Landa was in Arizona. Ms. Landa had been trained in accordance with Defendants' practices described in Paragraphs 113-25, and thus assured Ms. Ogdon that the program that she enrolled in would qualify her for licensure in the state of California.

189.    Based on these assurances from Defendants' representatives, Plaintiff decided to begin her classes in Grand Canyon's Master of Science in Psychology program.

190.    Because Mr. Granitz's title was "Counselor," Ms. Ogdon believed that he was her academic counselor. Thus, a week into her studies when she learned that Mr. Granitz would not be her academic counselor, she was surprised. She learned that instead, Ms. Landa would be her academic counselor. Later, Ms. Ogdon was assigned another Counselor, Chelsea Bebb, who had also been trained in accordance with Defendants' practices described in Paragraphs 113-25.

191.    Ms. Ogdon began school. To her surprise, there were no formal classes. For example, Defendants did not make available any lectures to her—either live or prerecorded. Instead, each class involved the following components: (a) a list of articles and reading materials to download and read; (2) a weekly online discussion board, where the instructor would ask three questions and each student would answer them online to obtain credit for participation and attendance; and (3) various research papers and assignments. Ms. Ogdon made various attempts to communicate with her instructors, but most were not responsive. Defendants intentionally designed the program in this way because the cost was minimal, and it resulted in more profits.

192.    At various points during her enrollment, Defendants published assorted course catalogues, handbooks, and other administrative materials. Defendants sometimes made some of these materials available to students, and in some, Defendants made vague statements regarding accreditation, but none of the statements contradicted what Mr. Granitz had told Ms. Ogdon. For example, in "Fall 2017 Academic Catalog," Defendants printed a statement informing students of the University's HLC accreditation, which Ms. Ogdon understood from Mr. Granitz to be comprehensive enough to allow her to work in California as a mental health therapist.

193.    In approximately the spring of 2019, Ms. Ogdon began looking into the process to become licensed in California. She had not heard anything from Ms. Bebb, her then Counselor, about the next steps, and because she had received little support during her time at the University, she began conducting research. After some internet searches, she visited the California Board of Behavioral Sciences, where she learned she required 60 credits and an internship. She knew she had only completed 36 credits, so in the spring of 2019 she reached out to Ms. Bebb for clarification and to ask how to get set up with an internship. Ms. Bebb told Ms. Ogdon via telephone that there was no internship required for her program. Ms. Ogdon pressed her for clarification, and then reminded Ms. Bebb that California required an internship for licensure, and asked if the University had a way to connect her with the right people in California. Ms. Bebb refused to assist or provide any clarification. Instead, Ms. Bebb told her that if she needed 60 credits, she should take additional classes.

194.    Ms. Ogdon became concerned, and began to contact organizations in California to try to determine where the disconnect between her and Ms. Bebb was regarding the next steps in obtaining her license. Eventually she discovered that Grand Canyon was not accredited in California and that she could not become a California-licensed mental health therapist as she had been led to believe by Defendants and their representatives.

195.    When Ms. Ogdon confronted Ms. Bebb and her supervisor Jordan, whose last name was not ever made known to Ms. Ogdon, in or about May 2019 about this development, they blamed the situation on "confusion with her first advisor."

196.    Because Ms. Bebb was financially motivated by Defendants to maintain high levels of student enrollment, as described in Paragraph 102-12, in or about May 2019, she even tried to talk Ms. Ogdon via telephone into taking *another* graduate program, a Master's in Clinical Mental Health Counseling, even though Ms. Bebb and Defendants knew that such a change would have resulted in hundreds of further wasted hours, tens of thousands in additional student loans, and, ultimately, the same licensure problems in California.

197.    Ms. Ogdon finished her degree in May 2019 with a 3.96 grade point average, despite working two jobs and barely making ends meet.  She has a diploma, which Defendants confusingly first told her was mailed to her, but later demanded $300 as a graduation fee to obtain it from Defendants. That piece of paper is all she has to show for her efforts, except a massive student loan debt.

198.    When Ms. Ogdon finished her degree program at Grand Canyon, she had 36 degree units. Ms. Ogdon did further research and determined that California requires a post-graduate degree program with 60 degree units to obtain licensure in mental health therapy. Thus, the Grand Canyon program was woefully insufficient for Ms. Ogdon's needs from the start. Grand Canyon has no program that would be accepted by the state of California toward becoming a licensed mental health therapist.

199.    As a result of Ms. Ogdon's reliance on Defendants' numerous misrepresentations and omissions described herein, and because Defendants designed and executed a scheme to defraud, all of which were directed to California by Defendants, Ms. Ogdon incurred over $22,000 in federal student loan debt to obtain her degree.

200.    Ms. Ogdon has struggled to find some use for her thousands of hours of work and enormous student loan debt. When she learned of the deception and that California would not accept her degree, she immediately tried to transfer her credits to an accredited school. She learned that no accredited school will give any credit for Grand Canyon courses.

201.    Ms. Ogdon has been paying her student loans. Recently, she has contacted the federal government to object to her student loan debt based on Defendants' many misdeeds. Ms. Ogdon filed her "Borrower Defense" claim with the federal government requesting to have the loans forgiven. The request is pending.

202.    Defendants intentionally designed a recruitment process that they knew would result in reasonable consumers, such as Ms. Ogdon enrolling by engaging in a pattern of omissions, misrepresentations, and high-pressure sales tactics. Defendants know that no reasonable consumer would have enrolled in the University absent such practices. Indeed, Ms. Ogdon was enrolled on the

basis of omissions and misrepresentations described in Paragraphs 169-89 that led her to believe the master's program was accredited in California and would meet all of her needs as a California mental health therapist candidate. Ms. Ogdon was also enrolled without full knowledge of the material facts regarding the program's suitability for work as a mental health therapist in California because Defendants had designed their fraudulent scheme to work to do just that. Defendants should never have pushed her to enroll — or even allowed her to enroll – in a program that failed to meet any of her needs.

203.    Ms. Ogdon never would have stayed in the program if not for the lies and omissions of Ms. Blanda that the program was accredited by California. Defendants' conduct was unethical, immoral, and illegal.

**E.    CLASS ACTION ALLEGATIONS**

204.    Plaintiff brings this class action on behalf of herself and the following Classes of persons:

> **Class:** All persons who were enrolled in an online professional graduate degree or certificate program at the University that was not accredited for licensure in the person's home state.

> **California Subclass:** All Class members who were citizens of the state of California at the time of their enrollment.

205.    Excluded from the Class are Defendants' officers, directors, affiliates, representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

206.    The time period for the Class is the number of years immediately preceding the date on which the original Class Action Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendants cease their improper conduct.

207.    <u>Numerosity</u>:  The members of the proposed Class and Subclass are so numerous that individual joinder of all members is impracticable.  Filings in 2019 show that the total student

population at the University exceeds 100,000. Public filings and releases show that over 80,000 of its students are online students and over 50% of online students are graduate students pursuing master's and doctoral degrees. The University's most popular programs are its post-graduate degrees for teachers and healthcare workers, and public filings state that its online students are spread proportionally throughout the country. Since 12% of the United States population lives in California, it can be expected that approximately 5,000 California residents are currently enrolled in unaccredited professional degree programs. Thousands of additional students were victims in recent years, like Plaintiff. Thus, many thousands of current and former students are likely included in the Class and Subclass. The exact number and identities of the members of the proposed Classes are unknown at this time and can be ascertained only through appropriate discovery.

208.  <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Plaintiff and the Classes and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include, but are not limited to:

a.  Do Defendants knowingly enroll students in professional programs which are unaccredited or otherwise not suitable for work in Regulated Professions in given states?

b.  Do Defendants' practices amount to fraud or misrepresentation?

c.  Do Defendants operate a racketeering scheme?

d.  Did Defendants violate federal law or regulations?

e.  Did Defendants violate California law?

f.  Were Defendants unjustly enriched as a result of their improper conduct?

209.  <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the members of the Class and Subclass. Plaintiff and all members of the Class and Subclass have been similarly affected by the actions of Defendants. Defendants' conduct as described herein is the same or substantially the same for Plaintiff and all members of the Class and Subclass. Defendants have established systematic and

automated policies and practices to govern recruitment and the manner in which staff enroll and keep students in non-accredited professional programs. Thus, the experiences of Plaintiff are typical.

210.   <u>Adequacy of Representation</u>:  Plaintiff will fairly and adequately represent and protect the interests of the Class and Subclass.  Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and Subclass and have the financial resources to do so.

211.   <u>Superiority of Class Action</u>:  Plaintiff and the members of the Class and Subclass suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class and Subclass is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

212.   <u>Risk of Inconsistent or Varying Adjudication</u>:  Class treatment is proper and this action should be maintained as a class action because the risks of separate actions by individual members of the Class and Subclass would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for the Defendants as the parties opposing the Class and Subclass; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impeded their ability to protect their interests.

213.   <u>Action Generally Applicable to Classes as a Whole</u>:  Defendants, as the parties that may potentially oppose certification of the Class and Subclass, have acted or refused to act on grounds generally applicable to them, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to them as a whole.

**FIRST CAUSE OF ACTION**
**Conduct and Participation in a RICO Enterprise Through a**
**Pattern of Racketeering Activity**
**(RICO 18 U.S.C. § 1962 (a), (c)-(d) ("RICO"))**
**On Behalf of Herself and the Class**
**Against All Defendants**

214.   Plaintiff realleges and incorporates by reference the prior Paragraphs of this First Amended Complaint as if set forth herein.

215.   Defendants are individuals and/or entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Defendants GCE, Grand Canyon, and Defendants Mueller, Bachus, and Meyer.

216.   Section 1962(a) makes it:

> unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

217.   Section 1962(c) makes it:

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c).

218.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(a) and (c), among other provisions.  18 U.S.C. § 1962(d).

219.    Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

220.    Beginning before the Class period and continuing to this day, Defendants have unlawfully increased their profits by knowingly enrolling students in professional degree and certificate programs that are not suitable for employment in those professional fields, including the Regulated Professions. The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association in fact of persons, including each Defendant and other unnamed co-conspirators.  That association in fact was structured by various contracts and non-contractual relationships between the Defendants, by which Defendants assumed different roles in agreeing to carry out a mail and wire fraud scheme to recruit students to enroll at the University without regard to qualifications or by illegally incentivizing recruiters to enroll students and claim federal student loan benefits for programs that were worthless to Class members.

221.    The members of the RICO enterprise all share a common purpose: to enrich themselves at Class members' expense by maximizing the revenues of Defendants by fraudulently obtaining tuition and fee revenue for unaccredited professional degree programs.  As set forth herein, Defendants benefitted financially from their scheme to defraud Plaintiff and the Class members, including by sharing the tuition and fees obtained from Class members and other monies which they would not have received but for the existence of the scheme.

222.    This RICO enterprise has existed for at least six years and continues to expand and operate pursuant to agreements entered into between and amongst Defendants and other unnamed co-conspirators. The RICO enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

223.    The enterprise was characterized by Defendants' pattern of false representations and omissions, made by Counselors and Advisors on behalf of Defendants to prospective students that

were designed to induce prospective students to enroll and stay enrolled in programs at the University, despite those programs not being suitable for employment, particularly in Regulated Professions, as described in Paragraphs 113-25, which enabled the enterprise to enroll students, gaining market share for GCE. This pattern of false representations was disseminated to prospective students in California and around the country, by the Counselors and Advisors, who were based in Arizona, Indiana, California, and states around the country, under the direction and on behalf of Defendants in Arizona. The dissemination typically was done using interstate telephone wires.

224.    The pattern of false representations and omissions described in the preceding Paragraph was further done to induce Class members to apply for, and become obligated to repay, federal student loans, which Class members around the country paid to Defendants in Arizona utilizing interstate wires.  It was known by Defendants that all such federal student loan funds would be wasted and that students would receive no benefit for their indebtedness.

225.    The true nature of Grand Canyon's programs was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiff and the Class members.

226.    Defendants profited from the enterprise, and Plaintiff and the Class members suffered because the enterprise significantly increased the amounts paid by them and for which they became indebted.  Defendants used the proceeds from this scheme to advance the scheme by funding and operating their marketing and recruiting machine, including through the use of the mails and interstate wires to contact more students, providing them misrepresentative information, including via phone, text, and email all over interstate wireline communications systems, and obtaining tuition payments and fees that offered no benefit, obtained via documents and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to the members of the Class, as described throughout.

227.    Defendants' scheme was reasonably calculated to deceive Plaintiff and Class members, all of whom are of ordinary prudence and comprehension, through the execution of their complex and

illegal scheme to misrepresent the usefulness of worthless unaccredited professional degree programs. Plaintiff and Class members would not have enrolled nor paid tuition and fees but for the illegal racketeering scheme operated by Defendants.

228.    Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiff and the Class, and each participated in the enterprise as follows:

229.    Defendant GCE directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to engaging in the following: (a) directly operating the University until approximately July 2018; (b) overseeing the creation of the non-profit entity Grand Canyon; (c) facilitating the Transaction described in Paragraphs 55-66, designed to use interstate wires to transfer tuition money intended to be invested in a charitable educational mission to benefit the students of the University from Grand Canyon to GCE to increase profits; (d) employing in leadership roles Defendants Defendants Mueller, Bachus, and Meyer, despite their oversight of fraud at University of Phoenix, making them prone to misusing student tuition dollars and violating DOE regulations; (e) adopting compensation policies for Counselors and Advisors that violate the Incentive Compensation Ban, as set forth in Paragraph 102-12, precisely because such policies encourage misrepresentations and lead to the defrauding of students; (f) actively encouraging misrepresentations from Counselors and Advisors to drive and maintain enrollment through training, policies, and control over the Counselors and Advisors, via interstate wire and the mail, as set forth in Paragraphs 113-25; and (g) receiving from students money in the form of tuition and fees, the majority of which were borrowed by those students from the DOE's federal student loan program, and were paid through interstate wires by Class members to GCE directly (until July 2018) and indirectly through Grand Canyon (after July 2018), and which GCE was eligible to receive only because the DOE understood it to be complying with key regulations, including the Incentive Compensation Ban and prohibitions on material misrepresentations and omissions, which it was not.

230.    Defendant Grand Canyon directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to engaging in the following:

(a) serving as the non-profit entity despite knowledge that its status as a non-profit is for fraudulent purposes; (b) facilitating the Transaction, designed to use interstate wires to transfer tuition money intended to be invested in a charitable educational mission to benefit the students of the University from Grand Canyon to GCE to increase profits; (c) employing as President Defendant Mueller, despite the fact that his financial motivations as CEO of GCE and history of fraud at University of Phoenix, make him an untrustworthy steward of student tuition dollars that were intended to designated for charitable purposes; (d) agreeing to outsource recruiting to GCE, which it knows has adopted compensation policies for Counselors and Advisors that violate the Incentive Compensation Ban, as set forth in Paragraph 102-12, despite knowing such policies encourage misrepresentations; (e) continuing to outsource recruiting and student services to GCE with the knowledge that GCE actively encourages misrepresentations from Counselors and Advisors over interstate wires to drive and maintain enrollment through training, policies, and control over the Counselors and Advisors, as set forth in Paragraph 113-25; and (f) receiving from students money in the form of tuition and fees, the majority of which were borrowed by those students from the DOE's federal student loan program, and were paid through interstate wires by Class members to Grand Canyon beginning around after July 2018, despite knowing that money would not be invested into the educational mission of the school, but instead, paid to GCE to increase shareholder profits and drive more fraudulent enrollments.

231.    Defendant Mueller directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using his role as President of Grand Canyon and CEO of GCE.

232.    Defendant Bachus controls and participates in the activities of the enterprise in a variety of ways as set forth herein, including using his role as Chief Financial Officer of GCE to direct, control, and participate in each of the actions undertaken to transfer monies, such as compensating the Recruiters and Counselors and other Defendants, faciliting the receipt of funds from the federal student loan program, and transferring funds away from the University and Grand Canyon and into GCE. In connection with his work preparing financial statements and finalizing disclosures to the SEC,

Defendant Bachus also oversees expenditures and revenues and makes recommendations on how to increase profitability at the expense of academics, to defraud students while ensuring that GCE can continue to draw in investors,  and in particular, in overseeing the expenditures and exchange of money needed to finance the Enterprise through the interstate wires.

233.    Defendant Meyer controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using his role as Chief Operating Officer of GCE to direct, control, and participate in each of the activities of the enterprise in a variety of ways as set forth herein, and in particular, in overseeing the day to day management of the activities described throughout this First Amended Complaint.

234.    During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this First Amended Complaint.

235.    Beginning at an exact date unknown to Plaintiff, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

236.    The acts set out below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiff and the Class for the benefit of Defendants.  Each Racketeering Act involved the same or similar methods of commission and participants and affected the Class similarly.

237.    Without the repeated predicate acts, the ability to conduct their fraud using the mail and telecommunications wires, and the money laundering, Defendants' business would not have succeeded.

238.    The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiff and the Class to enroll in the University.

239.    Defendants' wrongful conduct has caused injury to Plaintiff and the Class, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiff, the Class and the general public.

240.    Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

241.    To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including mail fraud and wire fraud.

242.    Defendants' ongoing pattern of racketeering activity has injured and continues to injure Plaintiff and the Class.  Defendants' pattern of mail fraud and wire fraud was the proximate cause of the injuries suffered by Plaintiff and the Class.

**Defendants Committed Multiple Acts of Mail Fraud**
**in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

243.    Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff and the Class out of money, in reliance on the mail. Defendants committed these acts with the intent to defraud Plaintiff and the Class.

244.    Defendants used the mail for the purpose of executing the fraudulent scheme herein.

245.    Specifically, Defendants agreed that GCE should rely on the mail to distribute advertising materials about the University from Arizona to Counselors and Advisors based around the country, as described herein. Defendants knew that these advertisements omitted material information about their programs' suitability for employment in Regulated Professions around the country, but mailed them to further the goals of the enterprise. GCE sent this mail to their hundreds of Counselors and Advisors at dozens of dates throughout the Class period, the specifics of which are in the exclusive control of Defendants.

246.    Defendants further used the mail to exchange critical paperwork with the DOE to maintain its access to the federal student loan program. The specifics of these mailings are in the exclusive control of Defendants.

247.    Defendants could not have furthered their fraud without the use of the mail.  For example, because Defendants sought to advertise to students around the country, they required the mail to distribute misleading advertisements to the various states, including California. More importantly, because Defendants require access to the federal student loan program to ensure that Class members can access and borrow funds that Defendants require to profit, Defendants depended on the mail to exchange information with the DOE to maintain such access. For these reasons, use of the mail to conduct the fraudulent activity was necessary and inevitable.

### Defendants Committed Multiple Acts of
### Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise

248.    Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff and the Class out of money, in reliance on interstate wires. Defendants committed these acts with the intent to defraud Plaintiff and the Class.

249.    Specifically, Defendants agreed that GCE should rely on interstate wires to disseminate advertisements via search engines and other online platforms as described herein. Defendants knew that these advertisements were targeted to drive enrollment without regard to the Class member's educational needs, but directed those advertisements to them over interstate wires to further the goals of the enterprise. GCE instructed that thousands of these ads be displayed to Class members every day of the Class period, and the specifics of those advertisements and the information displayed to Class members is in the exclusive control of Defendants and their advertising vendors.

250.    Defendants agreed that GCE should employ Counselors and Advisors to recruit students, using the interstate wires as set forth in Paragraphs 102-12 and to advertise the University in accordance with the procedures identified in Paragraphs 113-25. GCE instructed that thousands of interstate phone calls, some of which were recorded, by the Counselors and Advisors to Class members

every day of the Class period. Specific examples of such interstate calls appear in Paragraphs 174-89. The specific identities of other Class members who communicated with GCE's Counselors and Advisors in accordance with the policies described in Paragraphs 113-25 and the dates and times of each is in the exclusive control of Defendants.

251.     Defendants agreed that GCE and Grand Canyon should facilitate other communications with Class members over interstate wires in furtherance of the fraud. Students applied for admission, were notified of admission, and were provided online platforms to accept offers of admission and make payment and student loan arrangements to be enrolled in Defendants' programs over interstate wires. Student loan information in particular was shared between the Class members' home states, Defendants' headquarters in Arizona, and the DOE in Washington, DC.   Specific examples of such interstate wire communications appear in Paragraphs 187. The specific identities of other Class members who communicated with GCE's Counselors and Advisors and the details relating to their federal student loans secured in connection with the procedures set forth in Paragraphs 126-32, and the dates and times of each is in the exclusive control of Defendants.

252.     Because Defendants maintain offices around the country, wherein their recruiters and Counselors and Advisors are based and disseminate the misleading communications from, as described in Paragraphs 113-25, Defendants communicated with one another and the various employees via email, fax, and telephone.

253.     In engaging in this scheme to defraud, it was reasonably foreseeable that interstate wire communications would be used. Defendants in Arizona operated an online educational program and recruited and enrolled students based all around the country, using recruiters based all around the country to facilitate marketing and student support. More importantly, because Defendants require access to the federal student loan program to ensure that Class members can access and borrow funds that Defendants require to profit, Defendants knew and were dependent on the fact that borrowed funds would be wired from the DOE, in Washington, DC, to Defendants, and in particular, GCE and Grand Canyon, in Arizona.

254.    Defendants could not have furthered their fraud without the ability to use the telecommunications wires to share information with other Defendants. Because Defendants needed to communicate with students around the country and obtain funding via the federal student loan program, use of interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable.

### SECOND CAUSE OF ACTION
**Violation of Business and Professions Code § 17500**
**(Untrue or Misleading Representations)**
**On Behalf of Herself and the California Subclass**
**Against Defendants GCE and Grand Canyon**

255.    Plaintiff restates and incorporates by reference the allegations in all Paragraphs above as though fully set forth herein.

256.    From a date unknown to Plaintiff and continuing to the present, Defendants GCE and Grand Canyon, and each of them, have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that constitute violations of Business and Professions Code § 17500 *et seq.*, by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase Defendants' services.

257.    Defendants' untrue or misleading representations to the Subclass include, but are not limited to,  oral affirmative misrepresentations and omissions to Plaintiff and members of the Subclass that the University's professional graduate degree and/or certification programs are accredited for purposes of work in Regulated Professions in California, the pattern of which is described in Paragraphs 135-25. The oral and affirmative and oral misrepresentations made to Ms. Ogdon on which she relied are set forth in Paragraphs 169-89.

258.    At the time the representations set forth in the preceding Paragraph were made, Defendants knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

259.   As a result of Defendants' untrue or misleading representations and omissions, Plaintiff and the members of the Subclass are entitled to an order, pursuant to Business and Professions Code § 17535, enjoining such future conduct by Grand Canyon and GCE and such other orders and judgments that may be necessary to provide restitutionary disgorgement of Defendants' ill-gotten gains and to restore to any Class member all monies paid as a result of Defendants' false or misleading statements.

**THIRD CAUSE OF ACTION**
**Violations of Business and Professions Code § 17200**
**(Unfair Competition)**
**On Behalf of Herself and the California Subclass**
**Against Defendants GCE and Grand Canyon**

260.   Plaintiff restates and incorporates by reference the allegations in all Paragraphs above as though fully set forth herein.

261.   GCE and Grand Canyon have engaged in and continue to engage in, have aided and abetted and continue to aid and abet, and have conspired to and continue to inspire to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

262.   The business acts and practices engaged in by GCE and Grand Canyon that violate the Unfair Competition Law include:

    a.   Providing Plaintiff and members of the Subclass with untrue, misleading, unreliable, and/or inaccurate information concerning the accreditation of the University's professional graduate degree or certification programs in California;

    b.   Omitting material facts concerning the accreditation of the University's professional graduate degree or certification programs in communications with Plaintiff and members of the Subclass; and

c.  Enrolling Plaintiff and members of the Subclass in professional graduate degree or certification programs that were not accredited in California.

263.  These business acts and practices are unlawful because they violate laws including:

a.  Business and Professions Code § 17500, as set forth herein;

b.  Violating RICO, as set forth herein;

c.  34 C.F.R. 668.72(a), which prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs [. . . including. . .] false, erroneous or misleading statements concerning . . . [t]he type(s), specific source(s), nature and extent of its institutional, programmatic, or specialized accreditation";

d.  34 C.F.R. 668.72(c), which prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs [. . . including. . .] false, erroneous or misleading statements concerning . . . [w]hether successful completion of a course of instruction qualifies a student . . . to receive, to apply to take or to take the examination required to receive, a local, State, or Federal license, or a nongovernmental certification required as a precondition for employment, or to perform certain functions in the States in which the educational program is offered, or to meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment in a recognized occupation for which the program is represented to prepare students";

e.  34 C.F.R. 668.72(g), which prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs [. . . including. . .] false, erroneous or misleading statements concerning . . . [t]he availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet";

f.  34 C.F.R. 668.72(n), which prohibits "[m]isrepresentations concerning the nature of an eligible institution's educational programs [. . . including. . .] false, erroneous or

misleading statements concerning . . . [w]hether the academic, professional, or occupational degree that the institution will confer upon completion of the course of study has been authorized by the appropriate State educational agency;"

    g.   Federal and state laws and regulations, including those preclude misrepresentations to students and potential students and those governing accreditation standards and disclosures; and

    h.   Civil Code § 1770(a)(2)-(3), (5), (7), (9) and (14), as set forth herein.

264.    These business acts and practices are unfair in that GCE and Grand Canyon have caused students to pay tens of thousands of dollars, undertake huge credit obligations, and/or spend years of their lives in non-California-accredited professional graduate degree or certification programs that did not assist them in their chosen career path.  These acts and practices violate public policy and are also immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

265.    These business acts and practices are fraudulent in that Defendants' untrue and misleading representations and omissions regarding the accreditation of their professional graduate degree or certification programs are likely to, and in fact have, deceived the public.

266.    As a result of Defendants' unlawful, unfair, and fraudulent business acts and practices, Plaintiff and the members of the Class are entitled to an order, pursuant to Business and Professions Code § 17203, enjoining such future conduct by GCE and Grand Canyon and such other orders and judgments that may be necessary to provide restitutionary disgorgement of Defendants' ill-gotten gains and to restore to any Class member all monies paid as a result of Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Violations of Civil Code § 1770**
**(Consumer Legal Remedies Act)**
**On Behalf of Herself and the California Subclass**
**Against Defendants GCE and Grand Canyon**

267.    Plaintiff restates and incorporates by reference the allegations in all Paragraphs above as though fully set forth herein.

268.    GCE and Grand Canyon have engaged in and continue to engage in, have aided and abetted and continue to aid and abet, and have conspired to and continue to conspire to engage in practices that violate the Consumer Legal Remedies Act, Civil Code § 1770 *et seq.*, specifically unfair, deceptive, unlawful, and unconscionable commercial practices in connection with the sale of services to consumers.

269.    Plaintiff and the members of the Subclass are "consumers" as defined by Civil Code § 1761(d). The professional graduate degree or certification programs promoted and provided by GCE and Grand Canyon are "services" as defined by Civil Code § 1761(b).

270.    The practices engaged in by GCE and Grand Canyon that violate the Consumer Legal Remedies Act include:

      a.   Providing Plaintiff and members of the Subclass with untrue, misleading, unreliable, and/or inaccurate information concerning the accreditation of Grand Canyon's professional graduate degree or certification programs in California; and

      b.   Omitting material facts concerning the accreditation of Grand Canyon's professional graduate degree or certification programs in California in communications with Plaintiff and members of the Subclass.

*See, e.g.*, Civil Code §§ 1770(a)(2)-(3), (5), (7), (9), (14).

271.    As a result of Defendants' violations, Plaintiff and the members of the Subclass suffered ascertainable monetary losses in the form of tuition they paid and/or debts they incurred for Defendants' professional graduate program and certification programs (including interest), which they would not have incurred but for Defendants' unlawful practices.

272.    Pursuant to Civil Code § 1782, on or around May 22, 2020, Plaintiff notified Defendants Grand Canyon and GCE in writing via certified mail, return receipt requested, to Defendants' principal places of business, of the particular violations of § 1770, as set forth in Exhibit B. In that letter, Plaintiff demanded that these Defendants rectify the actions described above by

providing monetary relief, agreeing to be bound by their legal obligations, and giving notice to all affected customers of their intent to do so. Defendants have not complied.

## FIFTH CAUSE OF ACTION

**Quasi-Contract Claim for Restitution ("Unjust Enrichment")**
**On Behalf of Herself and the California Subclass**
**Against Defendants GCE and Grand Canyon**

273.    Plaintiff restates and incorporates by reference the allegations in all Paragraphs above as though fully set forth herein.

274.    GCE and Grand Canyon were unjustly enriched at the expense of Plaintiff and the other members of the Subclass, who were enrolled in programs that obviously did not meet their needs and then grossly and inequitably charged tuition which Defendants knew would not result in any benefit for the students.

275.    Plaintiff and the other members of the Subclass were unjustly deprived of money obtained by GCE and Grand Canyon as a result of their undisclosed, unfair, unscrupulous, and unconscionable recruiting and enrollment practices.

276.    It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation obtained from Plaintiff and the other members of the Class as a result of their wrongful conduct alleged in this First Amended Complaint.

277.    Plaintiff and the other members of the Subclass are entitled to seek and do seek restitution from GCE and Grand Canyon as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by GCE and Grand Canyon by virtue of their wrongful conduct.

278.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

279.    Under the doctrine of unjust enrichment, it is inequitable for GCE and Grand Canyon to be permitted to retain the benefits they have received, and are still receiving, without justification.

Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

280. The financial benefits derived by GCE and Grand Canyon rightfully belong to Plaintiff and members of the Subclass. As needed, a constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiff and the members of the Class.

281. Plaintiff and the members of the Subclass have no adequate remedy at law.

282. To the extent required, this claim is alleged as an alternative theory of relief.

WHEREFORE, Plaintiff, on behalf of herself and the proposed Class and Subclass, requests that this Court:

(a) Certify this case as a class action and appoint Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

(b) Award Plaintiff and the Class members declaratory relief as permitted by law or equity;

(c) Award injunctive relief and/or specific performance to require Defendants to provide Plaintiff and the Class members the promised education, credits, and degrees from an institution of higher education accredited by their respective states without additional charge to Plaintiff and the Class members;

(d) Award Plaintiff and the Class members actual, incidental, and consequential damages in an amount to be proven at trial, including any and all treble damages, compensatory damages, punitive damages, restitution, any applicable penalties and interest;

(e) For an award of all reasonable costs and attorneys' fees incurred by Plaintiff, pursuant to, without limitation, the California Legal Remedies Act and California Code of Civil Procedure § 1021.5;

(f) For trial by jury of all matters; and

(g) For such other and further relief as the Court may deem just and equitable.

1   Dated: August 4, 2020                    /s/ Kristen G. Simplicio
2                                            Kristen G. Simplicio (State Bar No. 263291)
                                             Hassan A. Zavareei (State Bar No. 181547)
3                                            **TYCKO & ZAVAREEI LLP**
                                             1828 L Street, Northwest, Suite 1000
4                                            Washington, District of Columbia 20036
                                             Telephone: (202) 973-0900
5                                            Facsimile: (202) 973-0950
                                             hzavareei@tzlegal.com
6                                            ksimplicio@tzlegal.com

7                                            Annick Persinger (State Bar No. 272996)
8                                            **TYCKO & ZAVAREEI LLP**
                                             1970 Broadway, Suite 1070
9                                            Oakland, CA 94612
                                             Telephone: (510) 254-6808
10                                           Facsimile: (202) 973-0950
                                             apersinger@tzlegal.com
11

12                                           *Counsel for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
─────────────────────────────────────────────