**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Katie Ogdon,<br><br>    Plaintiff,<br><br>v.<br><br>Grand Canyon University Incorporated, et al.,<br><br>    Defendants. | No. CV-22-00477-PHX-DLR<br><br>**ORDER** |

At issue is a motion to dismiss Plaintiff Katie Ogdon's first amended complaint ("FAC") filed on behalf of Defendants Grand Canyon University Incorporated ("GCU"), Grand Canyon Education Incorporated ("GCE"), Brian Mueller, Dan Bachus, and Stan Meyer. (Doc. 61.) The motion is fully briefed (Docs. 67, 71) and will be granted in part and denied in part.[1]

**I. Background**[2]

This case arises out of Ogdon's enrollment in an online master's degree program offered by Grand Canyon University ("University"). GCE once operated the University as a for-profit institution, but after the Department of Education imposed regulations on for-profit colleges to better inform prospective students about their odds of getting a job in their chosen field, Defendants restructured in an effort to evade those new regulations.

---

[1] The Court will address Defendants' motion to strike certain allegations from the FAC (Doc. 60) via separate order.

[2] The following summary is derived from the FAC (Doc. 18) and presumed true for purposes of this order. *See Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

GCE, a for-profit corporation, sold the University's assets to GCU, a non-profit corporation. At all relevant times, Mueller was the president GCU and GCE, Bachus was the chief financial officer of GCE, and Meyer was the chief operating officer of GCE. Though GCU maintained nominal control over the University, it outsourced operations to GCE. GCU provides the academic instruction and receives tuition payments from students, but it pays those tuition dollars to GCE for, among other things, marketing and recruiting services. Ogdon alleges that a small fraction of the tuition dollars paid by students actually goes toward academic instruction, with the rest going toward profit maximization.

In 2017, Ogdon began researching master's degree programs with the goal of obtaining a degree that would qualify her to work as a mental health therapist in California. Ogdon was interested in online programs because of their flexibility. Her research turned up the University. That summer, Ogdon completed a form on the University's website and, days later, was contacted by a counselor named Michael Granitz, who spent the next several weeks convincing Ogdon to enroll. Granitz knew Ogdon lived in California and wanted to practice there after graduation, and he assured her that the University's program would meet her needs. For example, Granitz assured Odgon that the University's program was accredited by the American Psychological Association and California licensing authorities, and that the University's regional accreditation from Higher Learning Commission ("HLC") acted like an umbrella that covered everything. This, according to Ogdon, turned out to be false. Although the HLC accreditation allowed the University to participate in the federal student loan program, it did not mean the University's program met the standards for licensure as a mental health therapist in California.

Based on Granitz's assurances and on what Ogdon describes as high-pressure sales tactics, Ogdon enrolled in the University in the Fall of 2017. Before starting classes, Ogdon spoke with another counselor at the University, Sabrina Landa, about the University's accreditation to ensure that the program in which she had enrolled was sufficient to allow her to become a mental health therapist in California. Landa assured Ogdon that the program would do so.

In early 2019, Ogdon began researching the process to become licensed in California. She learned that 60 credits and an internship were required to become licensed. Ogdon had completed only 36 credits and no internship. Ogdon asked another counselor, Chelsea Bebb, about getting an internship. Bebb told Ogdon that her program did not require an internship, and that Ogdon should take additional classes if she needed to earn 60 credits. Ogdon then began contacting organizations in California for information for licensure and discovered that the University's program did not meet the requirements for becoming a licensed mental health therapist in that state.

Ogdon completed her 36-credit degree program in May 2019, but her program would not be accepted by California licensing authorities. Ogdon tried to transfer her credits to another school but found no school willing to give credit for the University's courses. Ogdon alleges she never would have enrolled or stayed in the University's program had her various counselors not misled her into believing that the program met the requirements for licensure in California. All told, Ogdon incurred over $22,000 in federal student loan debt to obtain a degree that did not meet her needs.

Ogdon claims she was one of many victims of a racketeering scheme orchestrated by Defendants to defraud students by advertising programs in professions traditionally subject to state regulation as being suitable for employment even though those programs do not meet the licensure standards in the states where students would seek employment. She claims Defendants employed high pressure, deceptive sales tactics and published misleading advertisements to trick students into enrolling, without regard for whether the University's programs were suitable for practicing those professions in those students' states. Further, Ogdon alleges that Defendants instruct their recruiters to use titles such as "counselor" and "advisor" in order to mislead prospective students that they are qualified to provide academic advice, when in reality they are marketing professionals financially motivated to meet enrollment quotas. To that end, these recruiters are trained to obfuscate when current or prospective students ask about whether the University's professional degree programs meet the requirements for professional licensure in their respective states.

Based on these allegations, Ogdon brings a five-count, 282-paragraph putative class action complaint accusing all Defendants of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and accusing GCU and GCE of violating California's False Advertising Law ("FAL"), Unfair Competition Law ("UCL"), and Consumers Legal Remedies Act ("CLRA"), and of unjust enrichment. Defendants have moved to dismiss Ogdon's FAC in its entirety.

## II.     Legal Standard

"To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Well-pled factual allegations are accepted as true and construed in the light most favorable to the plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The Court's task merely is to determine whether those well-pled factual allegations plausibly state a claim to relief under governing law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    Analysis

### A. Rule 9(b)

The Federal Rules of Civil Procedure ordinarily require a complaint to contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), but they set a heightened pleading standard for allegations of fraud. "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind maybe alleged generally." Fed. R. Civ. P. 9(b). "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotations and citation omitted). Typically, Rule 9(b)'s heightened pleading standard applies only to averments of fraud; "[t]he rule does not require that allegations supporting a claim be stated with particularity when those allegations describe non-fraudulent conduct." *Id.* at 1104. But "[i]n some cases, the

plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Id.* at 1103-04.

Defendants argue—and Ogdon doesn't appear to dispute—that Counts I though IV of the FAC are predicated on a unified course of fraudulent conduct, such that those claims must be plead with the specificity Rule 9(b) demands. Defendants further argue the FAC fails to satisfy Rule 9(b) because it (1) doesn't specify which Defendants allegedly engaged in specific instances of fraud and (2) doesn't identify the specific content of any alleged fraudulent statement. (Doc. 61-1 at 12-14.) The Court disagrees.

First, the FAC adequately identifies which Defendants are being sued for what. When multiple defendants are sued in connection with an alleged fraudulent scheme, there is no requirement that the plaintiff identify every instance of fraudulent conduct for every defendant. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Though "Rule 9(b) does not allow a complaint to merely lump multiple defendants together," in fraud suits involving multiple defendants it is sufficient for a plaintiff to identify the role each defendant played in the alleged fraudulent scheme. *Id.* at 764-65. Here, the FAC identifies the role each Defendant played in the alleged fraudulent scheme (Doc. 18 ¶¶ 229-233.) The FAC also specifies when certain actions are alleged to have been taken on behalf or under the supervision of Defendants, it identifies by name several University counselors who made allegedly fraudulently representations, and for others it details job titles, training, and supervision. (*Id.* ¶¶ 113-25, 174-85, 195-96.) These allegations are sufficient to put Defendants on notice of their roles in the alleged fraudulent scheme.

Next, the FAC identifies the specific content of the alleged fraud, namely misrepresentations about whether the University's program met Ogdon's needs. Ogdon claims that her various counselors, both pre- and post-enrollment, knew she wanted to practice in California and, when asked, repeatedly assured her that the program in which she was enrolled would meet the requirements for licensure in California.

Defendants' arguments to the contrary aren't about the specificity with which Ogdon has alleged the fraud. Instead, Defendants argue that these statements are not actionable for reasons other than their specify.

Defendants argue that Granitz's assurance that the University had an excellent program that would meet Ogdon's needs is non-actionable puffery. The Court agrees that describing the University's program as "excellent" is non-actionable puffery but disagrees that assuring Ogdon the program would meet her needs falls into the same category. Whether the University's program met the needs of someone like Ogdon who wanted to practice as a mental health therapist in California is not necessarily a statement of opinion: it's plausibly a fact capable of verification.

Defendants next argue that Granitz's alleged representations about the University's accreditation are not actionable because they are true. This argument is unpersuasive for two reasons. First, at this stage, the Court accepts the allegations in the complaint as true, so the Court must presume that Ogdon's program was not properly accredited. Second, on this point the parties talk crossways. Defendants argue that Grantiz's alleged representation was true because the University is regionally accredited as an institution by HLC, and California does not accredit discrete college programs. But in her response brief, Ogdon explains that she has used the word "accreditation" in her FAC as a term of art to describe whether a professional degree program meets the minimum requirements for obtaining a corresponding professional license in a given state. And Ogdon plausibly alleges that the program she completed at the University did not meet those requirements in California. The Court won't dismiss the FAC based on what might turn out to be a semantic dispute.

Finally, Defendants argue that post-enrollment statements by Landa and Bibb are not actionable because Ogdon could not plausibly have relied on them in making her decision to enroll at the University. This argument is unpersuasive for two reasons. First, as the Court understands the FAC, Ogdon claims the post-enrollment statements of Landa and Bibb induced her to maintain her enrollment at the University. Had she not been misled into believing the University's program would qualify her for licensure in California,

Ogdon might have cut her losses earlier and enrolled in a different institution. Second, reasonable reliance generally is a question of fact inappropriate for resolution at the motion to dismiss stage.

"Rules 8(a) and 9(b) must be read in conjunction with one another. [A] [p]laintiff may state allegations of fraud in short, plain statements, provided that said statements put [d]efendants on adequate notice of the conduct alleged to be fraudulent." *Reilly v. Charles M. Brewer, Ltd. Profit Sharing Plan*, No. CIV 02-2218-PHX-EHC, 2004 WL 7339615, at *4 (D. Ariz. Sep. 30, 2004). Indeed, Rule 9(b) serves four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990). "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). Here, the Court is satisfied that Ogdon has sufficient prediscovery evidence of the misconduct she has alleged, and that the FAC is sufficiently detailed to put Defendants on fair notice of the particular circumstances for which they will need to prepare a defense.

**B. RICO**

Ogdon brings claims under RICO 18 U.S.C. § 1962(a), (c), and (d). To state a plausible § 1962(c) claim, Ogdon must allege that Defendants "participate[d] in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity[.]" *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). Section 1962(a) makes it unlawful for any person to reinvest income received from a pattern of racketeering activity. And Section 1962(d) makes it

unlawful to conspire to violate these other provisions. Defendants raise a host of arguments for why Ogdon's RICO claims fail, but the Court need not address them all because it finds two dispositive.

First, Ogdon has not plausibly alleged that Defendants conducted the affairs of a separate, distinct enterprise. RICO defines enterprise broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise is . . . a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 944, 948 (2009). However, "proof of a 'pattern of racketeering activity' is not, by itself, proof of an 'enterprise.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 549 (9th Cir. 2007) (internal citation omitted). "The enterprise and its activity are two separate things," *Id.* at 551, and liability under RICO "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' and not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphasis in original). Here, the FAC plausibly alleges that Defendants fraudulently induced Ogdon into enrolling and maintaining her enrollment at the University. But the FAC does not plausibly allege that Defendants' conduct were anything other than their ordinary business affairs. Indeed, Ogdon alleges that the "common purpose" underpinning the alleged enterprise was to enrich GCE, its officers, and its shareholders. (Doc. 18 ¶¶ 51-55.) But profit maximization is a normal purpose of a for-profit corporation like GCE. Although Defendants are not entitled to conduct their business affairs in a fraudulent manner, doing so does not transform those affairs into the conduct of an association-in-fact enterprise that is separate and distinct from the business itself.

Second, Ogdon's FAC does not allege each Defendant committed at least two acts of racketeering activity. "[I]n a multi-defendant § 1962(c) action, such as this one, a plaintiff must allege that each defendant individually committed at least two predicate acts." *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 605 (E.D. Mich. 2015). The FAC

fails to specifically and particularly allege that each named Defendant committed at least two separate acts of mail or wire fraud.

For these reasons, the Court dismisses Ogdon's RICO claims.

**C. State Law Claims**

**1. FAL**

Ogdon claims Defendants violated California's FAL, Cal. Bus. & Prof. Code § 17500, which makes it unlawful for a business to disseminate any statement that "is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Schellenbach v. GoDaddy.com, LLC*, 321 F.R.D. 613, 619 (D. Ariz. 2017) (internal citations omitted). Defendants argue that this claim fails because it is predicated on private conversations between Ogdon and University counselors, rather than on advertisements disseminated to the public.

The Court is not persuaded that the FAL requires a plaintiff to allege reliance on a public advertisement. "The [FAL's] prohibition extends to the use of false or misleading oral statements," *People v. Dollar Rent-A-Car Sys., Inc.*, 211 Cal.App.3d 119, 128 (Cal. App. 1989), which is what Ogdon has alleged here. What's more, Ogdon alleges that these oral misrepresentations by counselors were part of a broader pattern of sales tactics to induce students to enroll. These statements plausibly fall under the purview of the FAL.

In arguing otherwise, Defendants note that claims under the FAL are evaluated under a "reasonable consumer standard," which asks whether "members of the public are likely to be deceived." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (internal quotations and citations omitted). Defendants extrapolate from this standard that the only false or misleading statements cognizable under the FAL are those disseminated to the public at large. But this conclusion doesn't necessarily follow. To the contrary, "the reasonable consumer standard requires a probability 'that a significant portion of the general consuming public *or of targeted consumers*, acting reasonably in the circumstances, could be misled.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (emphasis added, and quoting *Lavie v. Procter & Gamble Co.*, 105 Cal.App.4th 496, (Cal.

1   App. 2003)). Here, Ogdon plausibly alleges that the targeted consumers—current and
2   prospective students—were reasonably misled by Defendants' statements concerning the
3   accreditation of its professional degree programs. This is sufficient to survive dismissal.

### 2. CLRA

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770. Defendants argue Ogdon's CLRA claim fails because she hasn't alleged fraud with particularity, nor has she alleged actual or reasonable reliance on Defendants' purported misrepresentations. For reasons already discussed in this order, the Court disagrees with both these arguments and therefore denies Defendants' motion to dismiss Ogdon's CLRA claim.

### 3. UCL

The UCL prohibits unfair competition, defined as "any lawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Civ. Code § 17200.

*Unlawful Practice*. Under the "unlawful" prong, the UCL "borrows violations of other laws and treats them as unlawful practices that [the UCL] makes independently actionable." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 n.8 (9th Cir. 2011) (internal quotations and citation omitted). "If a plaintiff cannot state a claim under the predicate law, . . . [the UCL] claim also fails." *Hadley v. Kellogg Sales Co.*, 243 F.Supp.3d 1074, 1094 (N.D. Cal. 2017) (citation omitted). Here, Ogdon alleges Defendants engaged in an unlawful business act by violating (1) the Higher Education Act, (2) the FAL and CLRA, and (3) unspecified federal and state laws and regulations.

Defendants argue that Odgon cannot maintain a UCL claim predicated on violations of the HEA because that law lacks a private cause of action. *See Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484-85 (9th Cir. 1995) (explaining that the HEA does not confer a private cause of action). The Court disagrees. Although the HEA "lacks an express private cause of action, . . . private UCL claims are barred only when the underlying statute either actually bars private rights of action or provides a 'safe harbor' that renders

the alleged conduct lawful. *Walker v. Life Ins. Co. of the Sw.*, 681 Fed. App'x. 599, 601 (9th Cir. 2017). Defendants have not cited to the Court any provision of the HEA explicitly barring private rights of action. The HEA simply lacks a provision expressly providing for one, and the Ninth Circuit has declined to read one into the statute by implication. Nor have Defendants identified any safe harbor provision in the HEA rendering their alleged conduct lawful. For these reasons, the Court is unpersuaded by Defendants' argument that Odgon cannot maintain a UCL claim predicated on alleged violations of the HEA.

Defendants also argue that Odgon cannot maintain a UCL claim predicated on violations of the FAL and CLRA because Ogdon fails to state plausible claims under those provisions. For reasons already discussed, the Court finds the FAC plausibly states FAL and CLRA claims and, therefore the Court rejects this portion of Defendants' argument.

The Court agrees with Defendants, however, that Ogdon has not adequately alleged a UCL claim predicated on violations of unspecified state and federal laws and regulations. Defendants are entitled to know what specific predicate laws are at issue. *See Ketab Corp. v. Mesriani & Assocs.*, 2:14-cv-07241-RSWL (MRW), 2015 WL 8022874, at *4 (C.D. Cal. Dec. 4, 2015) (dismissing UCL claims where the pleading failed to identify the specific predicate law alleged to have been violated). This catch-all aspect of Ogdon's unlawful practices UCL claim is dismissed.

*Fraudulent Business Act*. The UCL also prohibits fraudulent business practices. Defendants argue Ogdon hasn't plausibly alleged a fraudulent business act UCL claim because she has not alleged fraud with particularity. Because the Court finds Ogdon has adequately alleged her fraud claim, it rejects this portion of Defendants' argument.

*Unfair Practices*. Finally, "[t]he 'unfair' prong of the UCL creates a cause of action for a business practice that is unfair even if not proscribed by some other law." *In re Adobe Sys., Inc. Privacy Litig.*, 66 F.Supp.3d 1197, 1226 (N.D. Cal. 2014). California courts have not settled on a definition of "unfair" conduct, but two possible tests have emerged: (1) the so-called "tethering test," under which requires the alleged unfair conduct to be tethered to a specific constitutional, statutory, or regulatory provision, and (2) the "balancing test,"

under which the Court examines the challenges business practice and determines whether it is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and "weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id.* (internal quotations and citations omitted).

The Court finds the FAC plausibly states a claim under either test. Ogdon has plausibly tethered the alleged unfair conduct to perceived violations of the HEA, FAL, and CLRA. And, as alleged, Defendants' conduct—at bottom, lying to or misleading current and prospective students in order to induce them to enroll in degree programs that will leave them in debt but with little prosect of gainful employment in their chosen professions—plausibly is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the Court can discern no utility in such conduct that would so clearly outweigh such harms as to mandate dismissal of this claim. For these reasons, the Court finds Ogdon has plausibly alleged a UCL unfair conduct claim.

### D. Unjust Enrichment

Defendants argue Ogdon can't bring an unjust enrichment claim because the parties' relationship is governed by a specific contract, namely her enrollment agreement with the University. The Court denies Defendants' motion to dismiss Ogdon's unjust enrichment claim because the alleged enrollment agreement is outside the pleadings.

### E. Class Action Standing

Lastly, Defendants argue that Ogdon lacks class action standing to represent persons who enrolled in degree programs other than her own. The Court agrees with Ogdon that this argument is more appropriately raised and resolved at the class certification stage, where the Court may more concretely grapple with whether Ogdon is an adequate and typical representative of the class she seeks to certify. The Court therefore denies Defendants' request to dismiss Ogdon's class action allegations to the extent they pertain to degree programs other than her own, but without prejudice to Defendants' reasserting these standing arguments at the class certification stage, if appropriate.

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 61) is **GRANTED IN PART** and **DENIED IN PART** as explained herein.

Dated this 8th day of August, 2023.

_____
Douglas L. Rayes
United States District Judge